Irving Younger, J.
On July 25, 1966, Mr. and Mrs. Cecilio Molina signed a retail installment contract whereby they bought a freezer from Peoples Poods, Inc. for $1,222.15. On the next day, Peoples Poods, Inc., assigned the contract to Star Credit Corporation (for convenience, called “ Star ”).
On July 30,1966, Mr. Molina signed another retail installment contract, this time obliging himself to pay $445.82 to Peoples Food Packaging Corporation for a quantity of frozen and packaged foods. On the same day, Peoples Pood Packaging Corporation assigned the contract to Star.
The freezer and one third of the frozen and packaged foods were delivered to the Molinas, who made payments of $169.75 on account of the first contract and of $111.47 on account of the second. They never received the remaining two thirds of the foods because Peoples Food Packaging Corporation went out of business. When they stopped making payments, Star brought this action against the Molinas to recover the balance due on both contracts, together with late charges and attorneys’ fees. The Molinas counterclaimed for the payments of $169.75 made on account of the first contract.
Star contends that the commercial law of New York renders it immune to any claims or defenses the Molinas may have *292 against Star’s assignors, Peoples Foods, Inc., and Peoples Food Packaging Corporation. The first part of this opinion deals with Star’s argument.
The Molinas contend that they should be excused from performing their agreements because of fraud in the inducement, unconscionability, and breach of contract. The second part of this opinion deals with the Molinas’ argument.
I
Subdivision (1) of section 9-206 of the Uniform Commercial Code provides: “ Subject to any statute or decision which establishes a different rule for buyers or lessees of consumer goods, an agreement by a buyer or lessee that he will not assert against an assignee any claim or defense which he may have against the seller or lessor is enforceable by an assignee who takes his assignment for value and in good faith and without notice of a claim or defense”. A statute “ which establishes a different rule for buyers or lessees of consumer goods ” is subdivision 3 of section 403 of the Personal Property Law: “ No contract or obligation shall contain any provision by which: (a) The buyer agrees not to assert against an assignee a claim or defense arising out of the sale, but it may contain such a provision as to an assignee who acquires the contract * * * in good faith and for value and to whom the buyer has not mailed written notice of the facts giving rise to the claim or defense within ten days after such assignee mails to the buyer * * * notice of the assignment ’ ’.
Grasping what the statutes offer, the sellers included in each of the contracts with the Molinas a printed clause as follows: “ This agreement may be assigned without notice to Buyer. The Buyer agrees not to assert against an assignee a claim or defense arising out of the sale under this contract provided that the assignee acquires this contract in good faith and for value and has no notice of the facts giving rise to the claim or defense in writing within ten days after such assignee mails to the Buyer at his address shown above notice of the assignment of this contract.”
Star urges that it is the assignee of both contracts, that it acquired them in good faith and for value, that it gave the Molinas notice of the assignments, and that the Molinas did not within 10 days send Star a written statement of the facts giving rise to their claims and defenses, from all of which Star concludes that the Molinas’ claims and defenses are not cognizable against Star.
*293 We turn to the question whether Star acquired the contracts in good faith.
It is impossible to define “ good faith ” comprehensively and exactly. The draftsmen of the Uniform Commercial Code, in subdivision (19) of section 1-201 offer a succinct formulation — “ ‘ Good faith ’ means honesty in fact in the conduct or transaction concerned ’ ’ — and, in their Official Comment on the section, add that the phrase “ means at least what is here stated.” In short, ‘ ‘ good faith, ’ ’ as used in the code, stands for “honesty” and perhaps more. (Cf. Meinhard v. Salmon, 249 N. Y. 458.)
Star argues that it is an entity separate from both Peoples Foods, Inc., and Peoples Food Packaging Corporation; that it never sold anything to the Molinas; and that it did not participate with the sellers in the behavior which gives rise to the Molinas’ claims and defenses. Hence, Star urges, its conduct has been “ honest in fact.”
Were this a case of businessman dealing with businessman, Star’s argument would have considerable appeal. The Uniform Commercial Code is a charter for the ordering of economic life, and it is not unreasonable to expect a businessman to inform himself of all the rules coiled within the code and to protect himself against their springing out. This, however, is not a case which can be decided on the principle of caveat emptor. It is more than a commercial event. Although the Molinas are literate, they are hardly sophisticated enough to understand the “cut-off” provision of the contracts they signed. There was no parity of bargaining power between the Molinas and their sellers. If the Molinas are indeed “cut off” from asserting their claims and defenses, they will be required without further remedy to pay for foods they will never receive. For these reasons, we hold that “ good faith,” as used in section 9-206, means more than ‘ ‘ honesty in fact ’ ’ when, in circumstances such as those presented here, an assignee seeks to bar a consumer from asserting against the assignee claims and defenses to the underlying obligation.
We need not pause to search in the abstract for a definition of “good faith” appropriate to this case. The evidence -demonstrates that:
Each contract bears on its .reverse side a printed assignment form;
Each contract was in fact assigned within 24 hours of its execution;
Each contract contains provisions dealing with the rights of a “ holder ” or “ assignee ” as well as of a seller;
*294 Star took each contract at a discount of 20% from face value;
The account number noted on each contract by the seller was the account number used by Star;
Bach contract was signed by the seller “ subject to approval of Buyer’s credit.” No credit investigation could possibly have been made by the seller between the time of execution and the time of assignment. Yet Star wrote the Molinas after the assignment of the food contract to say that it had decided to accept the contract “ in view of your excellent credit rating and fine character references.”
We are therefore persuaded that the sellers entered into these contracts not primarily to sell a freezer and food to the Molinas, but primarily to obtain commercial paper for assignment to Star; and that Star accepted the assignments with full knowledge of the seller’s conduct and intention. Accordingly, we hold that Star is not an assignee of these contracts “in good faith ’ ’ and thus is not entitled to the protection of the “ cut-off ” provisions of section 9-206.
In view of this conclusion, we leave for another day the question whether Star should be considered ‘ ‘ to all intents and purposes a party to the agreement and instrument from the beginning ” (Commercial Credit Co. v. Childs, 199 Ark. 1073, 1077), or whether Star might not itself have breached a legal duty owed the Molinas by financing their contracts without inquiry into the underlying transactions (Connor v. Great Western Sav. & Loan Assn., 73 Cal. Rep. 369 [1968]) or whether Star should not be regarded with its assignors as a single economic enterprise. (Berle, “ The Theory of Enterprise Entity,” 47 Col. L. Rev. 343 [1947].)
II
Since section 9-206 is no bar, whatever claims and defenses the Molinas have with respect to these contracts may be asserted against Star. (Beck v. Sheldon, 259 N. Y. 208.) We turn to those claims and defenses.
The Molinas argue that there was fraud in the inducement. They have adduced no evidence to support this claim.
The Molinas argue that these contracts are unconscionable. The defense is authorized by section 2-302 of the code, and has received some judicial support. See authorities collected in Mindell, “ Doctrine of Unconscionability, Consumer Protection in New York ” (N. Y. L. J., Feb. 13 and 14, 1969, p. 1). On the evidence here — which includes not a word about the actual value of the freezer or of the foods — we might regard these *295 contracts as improvident; we cannot hold them unconscionable.
The Molinas argue finally that the sellers have breached these contracts. In order to decide the issue, we must determine precisely what the agreement was.
As stated at the beginning, there, were two documents, one dated July 25 and the other July 30. Mrs. Molina testified (and we accept her testimony) that a single salesman called upon her and in one interview sold her a “food plan” — food and a freezer to keep it in. She signed the freezer contract on that day, and her husband signed the food contract five days later when the first delivery of food was made. The freezer contract bears account number 8383, and the food contract number 5-8383. Each contract refers on its face to the possibility that a document would be attached providing for a plan or program,” in which event the contract and the attachment are to be deemed a single agreement. While each contract names a separate corporation as seller, the address of these corporations is the same., The contracts are on substantially identical printed forms, and both were assigned to Star by the same person signing as vice-president of the seller named in each contract.
The evidence persuades us that these are in fact not two contracts but a single agreement, contained in two memoranda, for the purchase of a food-and-freezer plan.
The sellers’ performance under this agreement was substantially defective. Only one third of the food was delivered. It was central to the bargain that food be supplied so that the Molinas could make efficient use of the freezer. The Molinas have not had a material part of what the sellers promised them.
When an obligor’s performance is substantially defective, the obligee may rescind the agreement. (Callanan v. Keeseville, Ausable Chasm & Lake Champlain R. R. Co., 199 N. Y. 268.) Here, the Molinas rescinded the agreement after receiving and consuming one third of the food for all of which they had promised to pay $445.82. They have already paid to Star a total of $281.22, which exceeds one third of $445.82 by $132.61. They have also had the use of the freezer since its delivery to them in July, 1966. I find that the fair value of this use is $132.61. Accordingly, on the entire case, judgment will be entered dismissing the complaint and the counterclaim without costs to either side. Star shall of course have the right to repossess the freezer.