Joseph F. Gagliardi, J.
 

 Motion "by plaintiff for an injunction
 
 pendente lite,
 
 and cross motion by defendant for an order dismissing the complaint for failure
 
 to
 
 state a cause of action, are disposed of in accordance with the following decision.
 

 Plaintiff, the lessee of certain premises operated as an automobile service station in the Town of Eastchester, brings this action for a permanent injunction to restrain defendant, the lessor, from terminating a “ franchise ” or
 
 “
 
 distributorship ” agreement. On July 5,1966, the parties executed a retail dealer contract and service station lease for a term of three years, both agreements to commence on August 1, 1966 and end on July 31, 1969, unless renewed as provided for in the agreements. Said contracts in fact superseded a certain similar agreement dated July 17, 1964 that plaintiff had executed with defendant or one of its affiliates. Plaintiff has been operating an automobile service station on the demised premises since July 17, 1964, and alleges that he has expended substantial sums of moneys for improvements thereon.
 

 The July 5,1966 retail dealer contract denominates defendant as
 
 “
 
 seller ” and plaintiff as “ buyer ” of defendant’s products listed in the agreement. The contract provides that the seller shall sell and the buyer shall buy not less than the minimum nor more than the maximum quantity of specified products for any contract year. Pursuant to the contract and the separate lease agreement of even date, plaintiff was obligated to purchase various petroleum products and automobile accessories from defendant and pay a monthly rental computed on the purchases of motor fuel. Pursuant to a “ Bent Security Bider ” incorporated in the lease, plaintiff deposited $1,500 as security, which sum was returnable to him upon termination of the agreements and in ‘ ‘ the event that [plaintiff] shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of said Lease and Betail Dealer Contract”. The parties also entered into an equipment loan agreement whereby defendant loaned plaintiff certain equipment necessary to the successful operation of the service station. Plaintiff agreed to
 
 *722
 
 maintain insurance and indemnify defendant against liability for injuries caused by person on the demised premises. These agreements are standard forms used by the defendant and common to the industry.
 

 s The retail dealer contract and lease each provide in paragraph two thereof that the original term of the agreements shall be for three years and is automatically renewable for successive three year periods “ provided that it shall terminate at the end of any current period (original or renewal) by notice from either party to the other, given not less than 90 days prior to such termination ”. Said paragraph also gives the defendant the right to cancel the agreements on 30 days ’ notice during the first 12 months of the agreements.
 

 On April 25,1969, defendant’s district manager notified plaintiff by certified mail that defendant elected to terminate the lease agreement because a “ further renewal of the lease would be inadvisable.” Plaintiff thereafter learned that defendant’s proposed reason for termination is its desire to convert the property into a diagnostic and repair service center. Plaintiff notified defendant that such conversion would require changes in the applicable zoning ordinances and requested defendant to extend the term of the. lease until such time as defendant could lawfully operate a diagnostic center. Plaintiff also requested that defendant attempt to locate another area where plaintiff could operate a service station. Defendant has refused the first request and done nothing about the second.
 

 The parties appear to agree that plaintiff’s performance has been more than satisfactory during the latest three-year period. Nor does plaintiff claim that defendant did not fulfill its obligations under the contract and lease. Furthermore, no questions of fraud, duress, deceit, coercion, mistake, misrepresentation or ignorance are raised.. Nevertheless, plaintiff contends that defendant’s arbitrary action is not in good faith as required by the Uniform Commercial Code and is an attempt to seize the good will created by plaintiff during his five-year leasehold. Plaintiff further contends that defendant’s failure to renew constitutes unfair practicés under the Federal Trade Commission Act (U. S. Code, tit. 15, § 45, subd. [a], par. [1]) and amounts to conduct in illegal restraint of trade under the Sherman Act (U. S. Code, tit. 15, § 1:). However, on a motion to dismiss pursuant to CPLR 3211 the court may, as requested by plaintiff in his affidavit in opposition to the cross motion, consider such motion as one for summary judgment
 
 (Mareno
 
 v.
 
 Kibbe,
 
 32 A D 2d 825 [2d Dept.]), and plaintiff must come forward with evidence which will raise an issue as to the facts pleaded (CPLR
 
 *723
 
 3211, subd. [c];
 
 Leonard
 
 v.
 
 Leonard,
 
 31 A D 2d 620). Considering the allegations in the complaint as to violations' of Federal statutes, and in the absence of any evidence contained therein or in the motion papers and affidavits submitted hereon which “ show a genuine issue of fact ”
 
 (Silinsky
 
 v.
 
 State-Wide Ins. Co.,
 
 30 A D 2d 1, 6), those “causes of action” are dismissed (see 8 Encyclopedia, New York Law of Contracts, ch. 29;
 
 City Trade & Ind.
 
 v.
 
 New Cent. Jute Mills Co.,
 
 25 N Y 2d 49). Nevertheless, “ [a] motion to dismiss a complaint cannot be granted if it contains any valid cause of action ”
 
 (Rosenblatt
 
 v.
 
 Birnbaum,
 
 16 N Y 2d 212, 216). The court looks to substance and not form
 
 (Kaufman
 
 v.
 
 Sweigard,
 
 27 A D 2d 717) and it must determine whether plaintiff has sufficiently set forth a cause of action for improper termination of a sales contract under the Uniform Commercial Code. ‘ ‘ The inquiry is whether the pleader has a cause of action rather than whether he has properly stated one ”
 
 (Kelly
 
 v.
 
 Bank of Buffalo,
 
 32 A D 2d 875).
 

 Before discussing the merits it should be noted that the relief requested by plaintiff (a temporary and eventually a permanent injunction) is not provided for in the code (Uniform Commercial Code, art. 2, part 7; see Ann. 17 ALR 3d 1010
 
 et seq., 11
 
 Uniform Commercial Code — Sales ”). However, it does provide that where the seller fails to deliver the goods the buyer, in a proper case, may obtain specific performance (Uniform Commercial Code, § 2-711, subd. [2], par. [b]). The code further provides that specific performance “may be decreed where the goods are unique or in other proper circumstances ” (Uniform Commercial Code, § 2-716, subd. [1]). Official Comment 2 to the last-cited section states in pertinent part: “The test of uniqueness under this section must be made in terms of the total situation which characterizes the contract. Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation ’ ’.
 

 While the complaint herein seeks a permanent injunction it is clear that the effect of a favorable decision will be to require defendant to maintain its business relationship with plaintiff, albeit perhaps at a different location. This is a form of specific performance which is properly accorded to requirements contracts and other agreements akin thereto (cf. 12 Carmody-Wait 2d, New York Practice, Injunctions, §§ 78:37, 78:41). As will be indicated
 
 infra,
 
 the Federal courts have not hesitated in the exercise of their equitable discretion to grant injunctions under the “Dealer’s Day-in-Court Act” (U. S. Code, tit. 15, § 1221) despite the absence of any statutory injiunctive remedy specifi
 
 *724
 
 cally conferred upon the franchise. Moreover, Governor Rockefeller did not approve the proposed New York State franchise legislation, which shall also be discussed hereafter, on the ground that the injunctive remedies granted to franchisees were too broad and that it would be advisable to leave to the courts any question of injunctive relief. Clearly, the power to issue injunctions is inherent in the courts
 
 (Schwartz
 
 v.
 
 Lubin,
 
 6 A D 2d 108, 110-111), and it is the policy of this State to make the remedy more available, not to restrict it
 
 (People ex rel. Bennett
 
 v.
 
 Laman,
 
 277 N. Y. 368, 383). Since the avowed purpose of the code is to enable the judiciary to fashion relief according to the commercial nature of the transaction, an injunction
 
 pendente lite
 
 or permanent in nature may, in the exercise of discretion, be granted pursuant to established principles
 
 (Polin
 
 v.
 
 Kaplan,
 
 257 N. Y. 277;
 
 Butterick Pub. Co.
 
 v.
 
 Loeser & Co.,
 
 232 N. Y. 86;
 
 Belmont Quadrangle Drilling Corp.
 
 v.
 
 Galek,
 
 137 Misc. 637;
 
 Spielman
 
 v.
 
 Sigrist,
 
 164 Misc. 622;
 
 Berrien
 
 v.
 
 Pollitzer,
 
 165 F. 2d 21; CPLR 6301; 12 Carmody-Wait 2d, New York Practice, Injunctions, §§ 78:46-48).
 

 The ultimate question raised herein is whether franchisors or distributors with tremendous bargaining power can terminate agreements with franchisees pursuant to their contract but without cause? Plaintiff offers for the court’s consideration a plethora of cases concerning price fixing and restraint of trade, which is not this case, and cases involving the “Dealer’s Day-in-Court Act ” (U. S. Code, tit. 15, § 1221; see General Business Law, § 197). While the Federal legislation governing the automobile industry is - not applicable at bar, it and other recent developments may serve as a helpful guide in aiding the court reaching a proper resolution of the issues presented.
 

 The “Dealer’s Day-in-Court Act” gives the automobile dealer a cause of action, where none previously existed, for damages where the automobile manufacturer has failed to act 'in “good faith” (U. S. Code, tit. 15, § 1222). Temporary injunctions have been granted enjoining termination of automobile franchises in “ bad faith” (see, e.g.,
 
 Bateman
 
 v.
 
 Ford Motor Co.,
 
 302 F. 2d 63; 310 F. 2d 805). The avowed purpose of the legislation is to alleviate the imbalance of bargaining power between automobile dealers and manufacturers, which imbalance would appear to exist in the gasoline service station industry. Even today Congress is considering extending .similar protection to small business distributors
 
 (S.
 
 2321, S. 2507 [1967]; S. 1967, H.R. 12074 [1969]). The proposed legislation is known as the ‘1 Fairness in Franchising Act ’ ’ and would require franchisors engaged in interstate commerce to show
 
 *725
 
 ‘ ‘ good cause ’ ’ in terminating or failing to renew franchise agreements. “ Good cause ” is defined as failure by the franchisee to comply with reasonable contract provisions or the use of bad faith by the franchisee in carrying out the terms of the franchise. Termination cannot occur unless 90 days’ advance written notice is given.
 

 During 1966 and 1967 hearings on the proposed Federal legislation were conducted by the Subcommittee on Antitrust and Monopoly. Significant opposition to the bills came from, all areas of industry. Noteworthy is the opposition put on the record by the defendant Mobil Oil Corporation (see 1968 hearing minutes, Committee on the Judiciary, ‘ ‘ Franchise Legislation ”, pp. 508-510). The gist of defendant’s opposition may be tersely summarized as follows: existing contract and antitrust law is more than adequate “ to prevent abuse of the franchise relationship ”. Congressional action on the proposed legislation has been delayed and the matter was referred to the Committee on the Judiciary.
 

 More recently, the New York State Legislature attempted to enact franchise legislation similar in import to the proposed Federal legislation (S. 4915). The legislation would have amended the General Business Law by providing a new article 9-C, entitled
 
 ‘ ‘
 
 Franchise Distribution. ’ ’ The new act would require franchisors to act in a fair, equitable and honest manner and in accordance with reasonable standards of fair dealing when granting, modifying, terminating, canceling or failing to renew a franchise. The legislation Avould also require the franchisor when failing to renew a franchise to purchase from the franchisee all facilities and inventory at fair market value, including good will. It is interesting to note that in its declaration of policy the Legislature stated: ‘ The legislature hereby finds that because of the substantial growth in the distribution of goods and services through utilization of the franchise system, in industries engaged in commerce or activities affecting commerce, which system is presently estimated to account for ten per centum of the nation’s gross material product and twenty-five per centum of all retail sales that the interest of many thousands of small franchisees requires that the great disparity in economic power now heavily weighted in the favor of franchisors be reduced by providing that the franchisor must deal in a fair and equitable manner with its franchisees as to all aspects of the franchise relationship; and that the existing judicial remedies to afford the relief to franchisees from injurious practices or
 
 [sic]
 
 franchisors are limited, ineffective, and
 
 *726
 
 too costly and franchisees should he provided with a means of simple, direct, and full legal .relief against franchisors failing to deal in a fair and equitable manner.
 

 “ It is hereby declared to be the policy of this state, through the exercise by the legislature of its power to regulate commerce partly or wholly within the state of New York to correct as rapidly as practical the inequities in the franchise system in such industries so as to establish a more equitable balance of power between franchisors and franchisees, to require franchisors to deal fairly and equitably with their franchisees with reference to all aspects of the franchise relationship and to provide franchisees direct, simple, and full judicial relief against franchisors who fail to deal fairly and equitably with franchisees.”
 

 Unfortunately for plaintiff the Governor was
 
 ‘ ‘
 
 constrained to withhold ’ ’ approval of the bill 1 ‘ because of the unreasonable injunctive rights it would grant dealers ” (memo filed with S. 4915, May 26, 1969).
 

 Under general contract principles and in absence of special circumstances, courts will not interfere with the parties’ contractual obligations
 
 (Graf
 
 v.
 
 Hope Bldg. Corp.,
 
 254 N. Y. 1). As our Court of Appeals has so aptly stated: ‘ ‘ it is not enough to induce a court of equity to interfere that a bargain is hard and unreasonable. Every man is presumed to be capable of managing his own affairs, and whether his bargains are wise or unwise, is not ordinarily a legitimate subject of inquiry in a court of either legal or equitable jurisdiction”
 
 (Parmelee
 
 v.
 
 Cameron,
 
 41 N. Y. 392, 395). Furthermore, it has been held that where a contract gives either party thereto the absolute unqualified right to terminate upon notice, the court is precluded from inquiring whether such termination was actuated by an ulterior motive
 
 (Brown
 
 v.
 
 Retsof Min. Co.,
 
 127 App. Div. 368 [2d Dept.]). Furthermore, in personal employment contracts terminable by either party after a specified period of time, the courts have been hesitant in upholding the employee’s cause of action for damages for improper discharge where he knew of the “precarious tenure of his position”
 
 (Douglass
 
 v.
 
 Merchants’ Ins. Co.,
 
 118 N. Y. 484, 489). Moreover, in other various contractual situations, termination clauses exercisable by either party upon reasonable notice have invariably been upheld by the courts (see 10 N. Y. Jur., Contracts, § 422; 9 Williston, Contracts [3d ed.], § 1017A; 5A Corbin, Contracts, § 1229); although every commercial contract carries with it the implicit obligations of good faith and fair dealing so as not to place one party at the mercy of the other
 
 (O’Neil Supply
 
 
 *727
 

 Co.
 
 v.
 
 Petroleum Heat & Power Co.,
 
 280 N. Y. 50, 54;
 
 Wigand
 
 v.
 
 Bachmann-Bechtel Brewing Co.,
 
 222 N. Y. 272, 277;
 
 Simon
 
 v.
 
 Etgen,
 
 213 N. Y. 589, 595; Richardson, Contracts [1956 ed.], §§ 357-362). Nevertheless, the implied obligations of good faith and fair dealing merely relate to obligations incurred by the parties during the term of the contract unless the relationship is continued beyond the expiration date
 
 (New York Tel. Co.
 
 v.
 
 Jamestown Tel. Corp.,
 
 282 N. Y. 365; see
 
 Lizotte
 
 v.
 
 Canadian Johns-Manville Co.,
 
 387 F. 2d 607). Accordingly, it would appear that unless plaintiff has some statutory cause of action he cannot prevail on this motion.
 

 Plaintiff contends that the Uniform Commercial Code requires defendant to exercise
 
 “
 
 good faith ” in terminating his agreements and that the clause permitting defendant to terminate without cause is unconscionable. Defendant, for its part, does not question the applicability of the afore-mentioned statute but argues that it in no way affects its rights under the contract. At first blush one might assume that the Uniform Commercial Code does not reach franchise or distributorship agreements (Uniform Commercial Code, § 2-102; Gellhorn, ‘
 
 ‘
 
 Limitations on Contract Termination Rights — Franchise Cancellations” 1967 Duke L. J. 465, 471; 22 Business Lawyer 1075 [1967]). However, the courts have not been reluctant to enlarge the type of commercial transactions clearly encompassed within the spirit and intendment of the statute (see
 
 Agar
 
 v.
 
 Orda,
 
 264 N. Y. 248, holding that under the former Personal Property Law [Uniform Sales Act] — the predecessor to the Uniform Commerical Code — a sale of corporate stock certificates constituted a sale of “ goods ”;
 
 Vitex Mfg. Corp.
 
 v.
 
 Caribtex Corp.,
 
 377 F. 2d 795, holding damage remedies provided for in the Uniform Commerical Code available in a non-code case; also, see,
 
 Recchio
 
 v.
 
 Manufacturers Trust Co.,
 
 55 Misc 2d 788). Furthermore, in
 
 Hertz Commerical Leasing Corp.
 
 v.
 
 Transportation Credit Clearing House
 
 (59 Misc 2d 226), the court held that the Uniform Commercial Code governed the rights of parties to an equiment leasing contract.
 

 The court there noted (p. 229): “ In view of the great volume of commercial transactions which are entered into by the device of a lease, rather than a sale, it would be anomalous if this large body of commercial transactions were subject to different rules of law than other commercial transactions which tend to the identical economic result.”
 

 That reasoning would appear to be of persuasive force here since franchising presently accounts for at least 20% of all retail business, equaling $80 billion in annual sales (115 Cong.
 
 *728
 
 Record, April 25, 1969, S. 4136). That the retail dealer contract is not so alien in every day commercial transactions and therefore falls within the purview of the Uniform Commercial Code seems clear (see
 
 Sinkoff Beverage Co.
 
 v.
 
 Schlitz Brewing Co.,
 
 51 Misc 2d 446, holding beer distributorship contract within terms of the code;
 
 Mastrian
 
 v.
 
 Freehofer Baking Co.,
 
 45 Pa. D. & C. 2d 237, holding “sales distributorship arrangement” within purview of the code). The code is designed to “ provide its own machinery for expansion of commercial practices ” and is intended for the courts to develop the law “ in light of unforeseen and new circumstances and practices ’ ’ within reason (Uniform Commercial Code, § 1-102, subd. [2], par. [a], Official Comment 1). However, the code provisions governing sales are limited in scope to “transactions in goods” (Uniform Commercial Code, § 2-102) and by no mean application of judicial sophistry can the lease of .real property be deemed to fall within its intendment
 
 (Newton
 
 v.
 
 Allen,
 
 220 Ga. 681, 17 ALR 3d 1010, 1029, “Uniform Commercial Code — Sales”). Consequently, if plaintiff be entitled to an injunction at all, such relief may only be directed against the termination of his retail dealer contract.
 

 At this posture of the pleadings, however, plaintiff has failed to convince the court that the retail dealer contract and lease were in fact separate contractual agreements (see
 
 Tibbetts Contr. Corp.
 
 v.
 
 O & E Contr. Co.,
 
 15 N Y 2d 324, 338;
 
 Portfolio
 
 v.
 
 Rubin,
 
 233 N. Y. 439; 7 Encyclopedia, New York Law of Contracts, §§ 1405-1407). The lease itself provides for a rental computed upon the sales of defendant’s products; and the retail dealer contract, in turn, states the obligations of the parties as to purchases and deliveries. Furthermore, the lease conditions the return of plaintiff’s security deposit upon his compliance with the provisions of both the lease and the retail dealer contract.
 

 Of course, the “paramount function”
 
 (Perlmutter
 
 v.
 
 Beth David Hosp.,
 
 308 N. Y. 100, 106) of the franchise is to provide defendant a means whereby it can sell its products while maintaining a degree of control over the retailer-franchisee. Nevertheless, the nature of the transaction and the intention of the parties as reflected by their writings inescapably indicate that each made a .single primary promise to the other, to wit: plaintiff to pay a rental computed upon sales and to use his best efforts in marketing defendant’s products; defendant to lease the demised premises including equipment facilities and to use its best efforts in making necessary deliveries (cf. Uniform Commercial Code, § 2-306, subd [2]). If the court were to separate
 
 *729
 
 the sale and leasing concepts
 
 (Perlmutter
 
 v.
 
 Beth David Hosp., supra,
 
 p. 104) and construe the agreements otherwise, it would be writing a new contract for the parties ‘ ‘ and the new contract so written * * * might be, for all we know, most unjust to one or the other party ”
 
 (New Era Homes Corp.
 
 v.
 
 Forster,
 
 299 N. Y. 303, 306). In short, if plaintiff were to prevail on fhi r motion as to the retail dealer contract, the court would be holding that the parties had intended plaintiff to have a
 
 ‘ ‘
 
 floating ” franchise, which is akin to giving plaintiff a paddle in a dry creek. Plaintiff has failed to persuade the court that this was the parties ’ intention. Moreover, the best evidence of intention is usually found by the way the parties conduct themselves as regards the contracts. At bar defendant elected to terminate the
 
 lease
 
 agreement and, yet, the parties have treated such election as terminating the entire franchise business relationship. Their conduct renders inescapable the conclusion that the parties intended the agreements to be indivisible (cf.
 
 Bories, Inc.
 
 v.
 
 Westinghouse Broadcasting Corp.,
 
 29 A D 2d 430).
 

 While the code generally provides that sales contracts carry the obligations of good faith, diligence, reasonableness and care (Uniform Commercial Code, § 1-102, subd. [3]), this is a codification of pre-code case law which was also codified in the predecessor statute and merely relates to the honesty imposed upon the parties during the
 
 term
 
 of the contract (former Personal Property Law, § 156, subd [2]; Uniform Commercial Code, § 1-201, subd. [19];
 
 Lizotte
 
 v.
 
 Canadian Johns-Manville Corp.,
 
 387 F. 2d 607,
 
 supra;
 
 cf.
 
 Tele-Controls
 
 v.
 
 Ford Ind.,
 
 388 F. 2d 48). Consequently, unless the termination clause be deemed unconscionable there is no implicit requirement that it be exercised other than as provided for in the contract.
 

 Nevertheless, assuming that the contracts are divisible and that the code applies to the retail dealer contract (Uniform Commercial Code, § 2-106, subd. [1];
 
 Foster
 
 v.
 
 Colorado Radio Corp.,
 
 381 F. 2d 222; see 1968 Annual Survey of American Law [N. Y. Univ.] 221-222), the court shall discuss plaintiff’s contention that the termination clause is unconscionable.
 

 The code provides that “when it is claimed” that a clause may be unconscionable the court “ shall ” afford the parties an opportunity to present evidence (Uniform Commercial Code, § 2-302, subd. [2]). It has been held that once the court accepts the possibility of unconscionability the hearing called for is mandatory
 
 (Sinkoff Beverage Co.
 
 v.
 
 Schlitz Brewing Co.,
 
 51 Misc 2d 446,
 
 supra;
 
 see 1 Anderson’s Uniform Commercial Code, § 2-302:5; cf.
 
 Wilson Trading Corp.
 
 v.
 
 Ferguson, Ltd.,
 
 23 N Y 2d 398, 404, n. 2). However, the court is of the opinion
 
 *730
 
 that that part of the termination clause reviewed here (the court expresses no view as to the 30-day notice provision during the first 12-month period), is not unconscionable per se, since the basic test is whether under the circumstances existing at the time of the making of the contract and ‘ ‘ in the light of the general commercial background and the commercial needs of the particlular trade or case, the clauses involved are .'so one-sided ” as to oppress or unfairly surprise a party (Uniform Commercial Code, § 2-302, Official Comment 1;
 
 Wilson Trading Corp.
 
 v.
 
 Ferguson, Ltd., supra,
 
 p. 403; Hawkland, Sales and Bulk Sales [PLI 2d ed.] pp. 22-24). The test does not reach the question of allocation of risks because of superior bargaining power (Uniform Commercial Code, § 2-302, Official Comment 1) and, in any event, neither party claims lack of mutual benefits inuring from the reciprocal covenants. Moreover, while recent cases concerning warranty disclaimers
 
 (Walsh
 
 v.
 
 Ford Motor Co.,
 
 59 Misc 2d 241) and exorbitant financing charges
 
 (Star Credit Corp.
 
 v.
 
 Molina,
 
 59 Misc 2d 290;
 
 Jones
 
 v.
 
 Star Credit Corp.,
 
 59 Misc 2d 189), appear to have adopted a broader test (see Bender’s U. C. C. Serv., § 2-302), the factual considerations peculiar to those cases have not emerged herein and plaintiff claims neither surprise nor oppression (see
 
 State Bank of Albany
 
 v.
 
 Hickey,
 
 29 A D 2d 993). Furthermore, the Court of Appeals had occasion recently to observe that there is nothing inherently wrong in having a termination clause such as the one at bar in a franchise agreement
 
 (407 E. 61st Garage
 
 v.
 
 Savoy Fifth Ave. Corp.,
 
 23 N Y 2d 275; see 1A Corbin, Contracts, § 265); and the code itself does not prohibit termination clauses on reasonable notice (Uniform Commercial Code, § 2-309, subd. [3]; see
 
 Sinkoff Beverage Co.
 
 v.
 
 Schlitz Brewing Co.,
 
 51 Misc 2d 446,
 
 supra).
 
 Additionally, the Federal Congress has gone on record that 90 days’ notice is more than ample to permit a franchisee to adequately wind up- his affairs (S. 1967; 115 Cong. Rec.,
 
 supra;
 
 also, see, Uniform Commercial Code, § 2-309, Official Comment 8, which speaks of “ a substitute ■arrangement ”).
 

 Plaintiff raises one other question which is set forth in his affidavit. The claim educed is that plaintiff has arbitrarily been singled out and denied a franchise renewal while it is the custom of the gasoline service industry to renew franchise agreements unless the franchisee has failed in a material respect to adhere to the contract provisions. Consequently, plaintiff contends, it was the intention of the parties when the contracts were executed to renew the franchise ad infinitum unless plain
 
 *731
 
 tiff gave defendant cause for acting otherwise. Assuming for this limited purpose that the retail dealer contract is so distinct and apart from the lease that the code applies, plaintiff’s contention is without merit.
 

 It has been said that parties who contract, knowing of a prevalent usage, by implication incorporate the usage in their agreement even where the contract seems clear and unambiguous (Vold, Law of Sales [2d ed.], pp. 53-58). However, New York case law apparently has admitted such evidence only where the contract provisions were ambiguous (see Uniform Commercial Code, § 2-202, N. Y. Ann., Official Comment 2). The Uniform Commercial Code has effected a change as regards sales contracts, and evidence of custom or usage in the trade is admissible to determine the parties’ true intention even if the contract terms are not ambiguous (Uniform Commercial Code, § 2-202, Official Comment 1, subd. [c]; also, see, Uniform Commercial Code, § 2-314, subd. [3]; § 2-316, subd. [3], par. [c]); and evidence of custom and usage is admissible in certain circumstances in order to fix the duration of the contract (6 Encyclopedia, New York Law of Contracts, §§ 903, 904). Nevertheless, the code itself codifies the well-established rule in the law of contracts that evidence of custom or usage in the trade is not admissible where inconsistent with the express terms of the contract (Uniform Commercial Code, § 1-205 subd. [4];
 
 Pink
 
 v.
 
 American Sur. Co.,
 
 283 N. Y. 290, 296;
 
 Newhall
 
 v.
 
 Appleton,
 
 114 N. Y. 140;
 
 Hopper
 
 v.
 
 Sage,
 
 112 N. Y. 530, 535;
 
 Walls
 
 v.
 
 Bailey,
 
 49 N. Y. 464;
 
 Richardson, Evidence
 
 [9th ed.], § 602). At bar the express terms of the contract cover the entire area of termination and negate plaintiff’s argument that the custom or usage in the trade implicitly adds the words
 
 “
 
 with cause” in the termination clause. The contracts are unambiguous, and no sufficient basis appears for a construction which would insert words to limit the effect of the termination clause (cf.
 
 Matter of Hart,
 
 31 A D 2d 548 [2d Dept.], app. dsmd. 24 N Y 2d 738). Only language
 
 consistent
 
 with the tenor of the otherwise complete agreement is admissible under the guise of
 
 “
 
 custom and usage ” and the code effects no change in that doctrine. Accordingly, the parol evidence rule precludes plaintiff from offering evidence that would vary and change the express terms of the written agreements (see
 
 Laskey
 
 v.
 
 Rubel Corp.,
 
 303 N. Y. 69; Uniform Commercial Code, § 2-202).
 

 An offshoot of the above argument, that plaintiff might allege in an amended pleading, is that the parties by their course of dealing modified the agreement or placed their own
 
 *732
 
 construction upon its terms. Nevertheless, assuming once again that the retail dealer contract alone is subject to tire code, the argument is fruitless.
 

 As it is well established that a contract is to be construed most strongly against its maker
 
 (Simon
 
 v.
 
 Etgen,
 
 213 N. Y. 589,
 
 supra),
 
 it is equally well settled that the parties through previous or subsequent conduct may place their own construction upon its terms
 
 (City of New York
 
 v.
 
 New York City Ry. Co.,
 
 193 N. Y. 543, 548;
 
 Neuhaus
 
 v.
 
 Long Is. R. R. Co.,
 
 30 A D 2d 825, affd. 23 N Y 2d 987;
 
 Battista
 
 v.
 
 Carlo,
 
 57 Misc 2d 495). Once again the code rejects those New York cases which require ambiguity in the contract before evidence of course of dealing or performance is admissible (Uniform Commercial Code, § 2-202, subd. [a]; cf.
 
 City of New York
 
 v.
 
 New York City Ry. Co., supra; Woolsey
 
 v.
 
 Funke,
 
 121 N. Y. 87;
 
 Syms
 
 v.
 
 Mayor, etc., of City of N. Y.,
 
 105 N. Y. 153). Nevertheless, the express terms of the agreement govern where the evidence offered is inconsistent therewith (Uniform Commercial Code, § 1-205, subd. [4]; § 2-208, subd. [2]). At bar, plaintiff would be put to the formidable task of overcoming paragraph 14 in the contracts, which provides that defendant’s “ right to require strict performance shall not be affected by any previous waiver or course of dealing ” (cf. Uniform Commercial Code, § 2-209). Additionally, Official Comment 4 to section 2-208 of the code observes that “ [a] single occasion of conduct does not fall within the language of this section ” (concerning course of dealing and performance). Accordingly, even the July 5, 1966 ‘
 
 ‘
 
 renewal ’ ’■ of the franchise, using the most liberal appellation applicable to the execution of the agreements sued upon, could not constitute a course of dealing or performance. As a matter of fact, defendant at its first opportunity under the superseded agreement elected to terminate the franchise. Consequently, under the circumstances and pursuant to precedent, defendant’s motion must be granted and plaintiff’s motion denied.
 

 Finally, it should be noted that plaintiff is not being given leave to replead for two reasons. First, he did not request permission to plead over (CPLR 3211, subd. [e]). Secondly, there is nothing that plaintiff could allege in a new pleading that would aid him in overcoming the obstacles discussed in this opinion. Assuming leave was granted and plaintiff met another
 
 motion to
 
 dimiss by alleging that the parties had intended plaintiff to have a
 
 ‘ ‘
 
 floating ’ ’ franchise, the result, of necessity, would be identical even if the code applied solely to the retail dealer contract. The termination clause is valid
 
 *733
 
 and not unconscionable and evidence of custom or course of dealing to vary otherwise clearly expressed terms is inadmissible.
 

 The court is not unsympathetic to plaintiff’s plight, but
 
 “
 
 stability of contract obligations must not be undermined by judicial sympathy ”
 
 (Graf
 
 v.
 
 Hope Bldg. Corp.,
 
 254 N. Y. 1, 4,
 
 supra;
 
 see
 
 Mico Mgt. Corp.
 
 v.
 
 Scaraggi,
 
 59 Misc 2d 984). It has been the sacredness of contractual obligations which has prevented courts of equity from imposing justice in many circumstances. Nevertheless, it is anticipated that ameliorative legislation covering business distributorships will shortly be a reality and perhaps this very case may provide the stimulus necessary to enactment. Copies of this opinion shall be sent to the appropriate legislative committees. The court cannot legislate (but cf.
 
 Flanagan
 
 v.
 
 Mount Eden Gen. Hosp.,
 
 24 N Y 2d 427) and is constrained to grant defendant’s motion and deny plaintiff’s motion, despite the apparent inequities.