Earl J. BABST and Super Tire Mart, Inc., Plaintiffs,

v.

FMC CORPORATION, Defendant.

Civ. A. No. S85-0031(NG).

United States District Court, S.D. Mississippi S.D.

July 29, 1986.

Joe Sam Owen, Albert Necaise, Gulfport, Miss., for plaintiffs.

Lee Davis Thames, John C. Henegan, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

GEX, District Judge.

Plaintiff Earl Babst is an adult resident citizen of Harrison County, Mississippi. Babst is the President and principal shareholder of the corporate Plaintiff, Super Tire Mart, Inc., a Mississippi Corporation. Super Tire Mart, Inc., conducted a wholesale passenger and light truck tire business in Gulfport, Mississippi.

Defendant, FMC Corporation, is a Delaware Corporation which is engaged in the manufacture of various products, including, but not limited to, automotive service products and related equipment.

In or about September, 1984, Babst and another individual, David Zeitfus, became interested in organizing a business that would engage in the sale of automotive service equipment. Zeitfus, through former employment, was knowledgeable of auto service equipment, particularly the auto service equipment offered by FMC.

Babst met with Michael Jones, a local FMC Corporation representative, concerning the acquisition of distribution rights from FMC for automotive service equipment. Babst was informed by Jones that FMC was dissatisfied with the volume of business that was being conducted by its current local distributor, Beach Tire Mart. Jones indicated that FMC was desirous of doing business with Babst and gave Babst an application kit for a Floor Plan Financing Agreement with FMC Finance Corporation, a separate division of FMC Corporation, under which FMC automotive service equipment is financed.[1] Jones took a completed financing agreement application and power of attorney, and a financial statement from Babst. Jones allegedly advised Babst that he would receive the distributorship rights. Jones told Babst that he would forward the completed application and financial statement to Ray Khoury, FMC zone sales manager, and that Khoury would be in contact with Babst.

Following receipt of the materials given by Babst to Jones, Ray Khoury spoke with Babst by telephone on October 5, 1984. According to Khoury's deposition testimony,[2] in that telephone conversation he indi-

---

1. In order to participate in the program, it is necessary to submit and complete the following documents:

1. Application Set—Floor Plan Financing
   a. Complete *all* information requested. Incomplete forms will be returned for completion;
   b. Part I should be signed by principal(s) or officer(s);
   c. If you are a corporation, then Part 2 should be completed and signed by principal(s) or officer(s);
   d. Part 3 (Personal Guaranty of Payment) should be completed and signed by principal(s) or officer(s) and wives;
   e. Detach Page 2 and keep for your files.

2. Financial Statement Requirements
   a. Audited balance sheets and profit and loss statements for the last two (2) years or signed statements prepared by your accountant will suffice if audited statements are not available.
3. UCC–1 (if enclosed) Financing Statement
   a. The principal(s) or officer(s) should sign in the space provided for "signature of Debtor."
4. Request for Insurance
   a. Complete the top portion of this form and sign in space provided under the business name.

Before we can establish a line of credit, all of the documents outlined above are required.

2. Abstract of Deposition of Randall Khoury:

Q. Before the purchase order would have been filled, would it have been necessary for Super Tire Mart, Inc., to be recognized as a jobber or a dealer or distributor for FMC?

A. First of all, he would have had to have become creditworthy.

Q. Do you know if he became creditworthy?

A. There was a credit line established, yes.

Q. Did anyone from FMC tell him to go ahead and file his request for credit?

A. Yes.

Q. Who did that?

A. I did.

Q. Are these agreements in writing that you have, say, for example, the agreement that was with Beach? Is that a written distributorship agreement?

A. No, sir.

Q. Verbal?

A. Say again?

Q. You say its a verbal agreement?

A. Yes.

Q. Are most of your agreements with your jobbers verbal?

A. All.

Q. I'm sorry?

A. Most all are. I don't know incidences where they are not.

Q. Do you know if Mr. Babst or Super Tire Mart, Inc., obtained a certificate of insurance pursuant to the request from the FMC Finance Corporation?

A. They had.

cated to Babst that the distributorship had been granted to the Plaintiffs; FMC Corporation, as a matter of course, wanted time to notify other distributors in the Gulfport area that an additional distributor had been added. Khoury instructed Babst to submit his purchase order to FMC on October 5, 1984, and told him that, upon notification to all affected distributors, the Plaintiffs' October 5, 1984, order would be shipped. Khoury estimated that shipment would commence in approximately two or three weeks.

The Plaintiffs, in particular, Super Tire Mart, Inc., having been advised by Jones that the FMC distributorship had been granted them and having been informed by Khoury that their order for goods had been accepted and would be shipped in the next few weeks, embarked upon an advertising and marketing program to promote sales of FMC products. Babst and Zeitfus formed a Mississippi Corporation, Southern Automotive Equipment, Inc., to serve as the entity to distribute and sell the FMC products purchased on Super Tire Mart, Inc.'s line of credit.

Several weeks passed and the Plaintiffs had not received shipment of their October 5, 1984, order. Being concerned, Babst telephoned Mr. Duckwitz, national sales manager for FMC Corporation, on October 29, 1984. Based on the conversation with Duckwitz, Babst got the impression that FMC Corporation did not intend to ship his order at any time; Duckwitz invited Babst to cancel the order, but informed Babst that Khoury was the person with whom he should communicate. Immediately after Babst's conversation with Duckwitz, the Plaintiffs forwarded a letter to Khoury dated October 29, 1984, seeking assurance that their October 5, 1984, order would be filled as previously promised.

On October 30, 1984, Mary Scroggins of FMC Corporation wrote Babst sending him two UCC-1 Financing Statements and a proof of insurance form indicating that the documents would have to be filled out before FMC could extend a line of credit to Super Tire Mart, Inc.[3] However, in her deposition, Scroggins testified that FMC Finance Corporation had approved the Plaintiffs' line of credit.[4] According to

Q. Look at the second paragraph of that letter, and I can read it to you so you know what I'm talking about. He says on the day our order was placed, I spoke to you on the phone. It that true?

A. Yes.

Q. I didn't hear your answer. I'm sorry.

A. Yes. Is that better?

Q. It says at the time you mentioned the necessity of explaining to Beach Tire Mart why you were adding another distributor to the area. Is that true?

A. I don't think I explained the necessity of explaining to Beach. What I expressed was that we needed to notify any and all distribution in an area that we are planning to add additional distribution. I do that as a matter of course in all of my areas.

Q. In the third paragraph it says we understood from our conversation with you and Mike Jones that you would begin shipping our order within two or three weeks. Is that true?

A. Yes.

---

**3.** Letter dated October 30, 1984, addressed to Mr. Earl J. Babst, Super Tire Mart, Inc., from Mary Scroggins, Credit Assistant, FMC Corporation, which reads as follows:

Enclosed are two UCC-1 financing statements and a proof of insurance form for you to complete, sign and return to my attention. These documents are required, by FMC Finance before they can extend a credit limit to Super Tire Mart, Inc.
Thank you for your order.
If you have any questions, call me at 501 327 4433 extension 107.

**4.** Abstract of deposition of Mary Scroggins:

Scroggins testimony, Babst's order was ready to be filled as far as credit was concerned; her recollection was that the marketing division had placed a hold on Super Tire Mart, Inc.'s approved order.

On November 7, 1984, Babst forwarded the requested UCC–1 financing statements and certificate of insurance to Scroggins; on that same date Khoury telephoned Babst and told him that Super Tire Mart, Inc., would not be made a distributor of FMC in contradiction of his October 5, 1984, telephone conversation with Babst and Michael Jones's statement to Babst

13 7–11
Q. Now I believe you indicated to me or told me a while ago that when you received the floor plan financing set along with the credit application, it was forwarded on to FMC financing?
A. Yes.

13 12–13
Q. Is that a separate division of FMC?
A. It's a separate entity.

17 10–18
Q. Once you received that financial statement, the balance sheet, and statement of income, what did you do with those documents?
A. I forwarded them to FMC Finance.
Q. Was Super Tire Mart, Inc., requesting a line of credit?
A. Yes, they were.
Q. How much?
A. I believe it was $100,000.00.

18 21–25
Q. You did receive approval from FMC Finance of $100,000.00?
A. Yes, we did.
Q. So that was the okay to extend the credit to Super Tire Mart, Inc.?

19 1
A. Yes.

19 2–11
Q. How did you receive that approval from FMC? Was it by telephone or did you receive a written memo indicating the approval had taken place? How did you receive that approval?
A. It was by phone.

20 4–11
Q. Super Tire Mart complied with all conditions that your particular department has sent for?
A. Yes.
Q. Was the purchase order ready to be filled?
A. As far as credit, yes, it was approved.
Q. Did you notify the marketing department that the credit has been approved?
A. I told them that we would, yes.

20 16–21
Now who made you aware that marketing was not going to approve it?
A. I believe Ron Wenger told me it had been put on hold.
Q. Did he tell you why it had been put on hold?
A. No.

23 10–25
Q. They obtained approval on everything but the final approval from marketing, is that true?
A. Yes.
Q. Did you have any further conversation with Mr. Khoury after you were advised by marketing that Super Tire Mart, Inc., was not going to be approved?
A. No.
Q. About this particular case?
A. No. I was never advised by marketing they would not be approved.
Q. I thought marketing told you they were going to put it on hold?
A. Yes.

that Plaintiffs had been granted the FMC distributorship.

Plaintiffs filed suit against FMC Corporation asserting claims for breach of contract and negligent misrepresentation in the Circuit Court of Harrison Count, First Judicial District, Mississippi. The Defendant removed the litigation to this Court, diversity jurisdiction being present. Discovery was had and Defendant moved for summary judgment on Plaintiff's breach of contract claim.

## I. Defendant's Conditions Precedent Argument.

Defendant asserts in its motion for summary judgment that no contract was ever entered into between the parties because certain conditions precedent to the finalization of a binding contract were not met by Plaintiffs before Khoury telephoned Babst on November 7, 1984, and informed him that no distributorship would be granted to Plaintiffs. Specifically, Defendants set forth Scroggins', October 30, 1984, letter to Babst indicating that Plaintiff had not submitted the UCC–1 financing statements and proof of insurance form required in the FMC Finance Corporation Floor Plan Financing Agreement application to support their contention that no contract was ever formed.

Plaintiffs, in response, assert that Defendant, through its agents Khoury and Jones, granted distributorship rights to Babst and Super Tire Mart, Inc., thus waiving any objection to the enforcement of the contract on grounds of a failure to fulfill conditions precedent. Additionally, Plaintiffs set for the the deposition testimony of Scroggins, an FMC employee, indicating that the Plaintiffs floor plan financing application had been accepted without all requisite documents having been filed.

The Restatement (Second) of Contracts Section 229 (1981) states:

To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.

In *Burger King Corporation v. Family Dining, Inc.*, 426 F.Supp. 485, 492–93 (E.D. Pa.1977), the district court, in applying Restatement (First) of Contracts Section 302, predecessor to Section 229, wrote:

Nothing is commoner in contracts than for a promisor to protect himself by making his promise conditional. Ordinarily a party would be entitled to have such an agreement strictly enforced, however, before doing so the Court must consider not only the written contract but also the acts and conduct of the parties in carrying out the agreement ... [A]fter one party by conduct indicates that literal performance will not be required, he cannot without notice and a reasonable time begin demanding literal performance.

■ Although this is a diversity action and, as such, Mississippi substantive law applies, this Court has a duty, where the Mississippi Supreme Court has not had an opportunity to address an issue, to make an *Erie*-bound estimation of the state court's views. The Court concludes that the Mississippi Supreme Court would follow the Restatement view that a party can waive the required fulfillment of non-material conditions precedent to a contract and adopt the logic set forth in the *Burger King* case.

Having forecast the Mississippi Supreme Court's determination of the substantive aspects of Defendant's conditions precedent argument, the Court finds that questions of fact have been raised regarding Defendant's waiver of the required fulfillment of conditions precedent by Plaintiffs' thus prohibiting summary judgment at this time. *See Rose v. Mitsubishi International Corporation*, 423 F.Supp. 1162, 1167 (E.D.Pa.1976).

## II. Defendant's Statute of Frauds Defense.

Defendant next sets forth that, if a contract between the Plaintiffs and FMC Corporation was entered into, the contract is unenforceable for failure to satisfy the statute of frauds. The Court would note at

this point that all FMC distributorships are granted on oral agreement.[5]

In FMC Corporation's motion for summary judgment, Mississippi Code Annotated Section 15-3-1, the state's general statute of frauds was raised as a bar to Plaintiffs' contract claim.[6] Since the crux of the alleged distributorship agreement between the Plaintiffs and FMC Corporation involved the sale of automotive goods,[7] the Court, *sua sponte*, raised this question whether the transaction was not more appropriately classified as a transaction involving the sale of goods as defined under the Uniform Commercial Code as adopted in Mississippi, thus making the more specific statute of frauds provision embodied in the UCC at Section 75-2-201[8] applicable and requested supplemental briefs from both counsel on the issue.

■ Having found no Mississippi case on point, the Court, again making an *Erie*-bound prediction, finds that the alleged contract between Plaintiffs and FMC Corporation falls under the Uniform Commercial Code. The majority of the cases from other jurisdictions, when faced with the question of the applicability of Article 2 of the Uniform Commercial Code to franchise/distributorship agreements have forcefully concluded that franchise/distributorship agreements fall squarely under Article 2. In *Division of Triple T Service, Inc. v. Mobil Oil, Co.*, 6 UCC Rep. 1011,

---

**5.** *Abstract of Deposition of Robert Duckwitz:*

| Page | Line | Content |
|---|---|---|
| 10 | 21–24 | Q. When a dealership arrangement is set up with FMC, I have been advised that it's strictly a verbal arrangement. It is not a written agreement. Is that true? |
| | | A. That is true. |
| 11 | 1–3 | Q. Is that the same arrangement that you have with the jobbers? |
| | | A. Yes, sir. |

---

**6.** Section 15-3-1 provides in relevant part:

An action shall not be brought whereby to charge a defendant or other party: ...

(d) upon any agreement which is not to be performed within the space of fifteen months from the making thereof; ... unless, in each of said cases, the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith or signed by some person by him or her thereunto lawfully authorized in writing. Miss.Code Ann. Section 15-3-1 (1972).

**7.** See equipment order dated October 5, 1984, addressed to FMC Automotive Service Equipment Division from Earl J. Babst, President, Super Tire Mart, Inc., attached hereto as "Appendix A".

**8.** Section 75-2-201 reads:

(1) Except as otherwise provided in this section, a contract for the sale of goods for the price of five hundred dollars ($500.00) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten (10) days after it is received.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2-606) [Section 75-2-606]. Miss.Code Ann.Section 75-2-201 (1972).

1017–18, 60 Misc.2d 720, 304 N.Y.S.2d 191, 199 (Supr.Ct.1969), the New York Supreme Court wrote:

> At first blush one might assume that the Uniform Commercial Code does not reach franchise or distributorship agreements ... However, the courts have not been reluctant to enlarge the type of commercial transactions clearly encompassed within the spirit and intendment of the statute.... Th[is] court [has] noted in [another case]:
>
> > "In view of the great volume of commercial transactions which are entered into by the device of a lease, rather than a sale, it would be anomalous if this large body of commercial transactions were subject to different rules of law than other commercial transaction which tend to the identical economic result."
>
> That reasoning would appear to be of persuasive force here since franchising presently accounts for at least twenty percent of all retail business.... That the retail dealer contract is not so alien in everyday commercial transactions and therefore falls within the purview of the Uniform Commercial Code seems clear....

See also, Artman v. International Harvester Co., 355 F.Supp. 482, 486 (W.D.Pa. 1973) (Pennsylvania recognizes distributorship/franchise agreements as falling within sales section of U.C.C.); Seaman's Direct Buying Service, Inc. v. Standard Oil, Co., 39 UCC Rep. 46, 52, 36 Cal.3d 752, 206 Cal.Rptr. 354, 359, 686 P.2d 1158, 1163 (1984) (California recognizes dealership agreements as covered under Article 2 of the U.C.C.); M.J. McCarthy Motor Sales Co. v. Van C. Argiris & Co., 27 UCC Rep. 631, 634, 78 Ill.App.3d 725, 33 Ill.Dec. 529, 535, 386 N.E.2d 1253, 1259 (1979) (Illinois/same). But see Lorenz Supply Co. v. American Standard, Inc., 419 Mich. 610, 614–15, 358 N.W.2d 845, 847 (Mich.1984) (Michigan holds that only where quantity terms are certain in distributorship agreement does Article 2 apply). This Court concludes that the Mississippi Supreme Court would adopt the majority view if called on to do so.

As noted earlier in this opinion, the alleged distributorship agreement in this case, like all FMC Corporation distributorship agreements, was an oral contract. Section 75–2–201 would bar enforcement of Plaintiffs' claim unless Plaintiffs' claim fits within one of the exceptions enumerated in 75–2–201(3).

It appears that Plaintiffs, in the abstracts of depositions taken of Defendant's agents, have extracted a judicial admission that a contract existed between the parties and that Plaintiffs first shipment order was accepted based on that contract. In discussing Section 75–2–201(3)(b), the Mississippi Supreme Court observed in *Franklin County Cooperative v. MFC Services*, 441 So.2d 1376, 1378 (Miss.1983) that an admission by a corporate agent that a contract was made would afford the plaintiff the opportunity to enforce an alleged oral contract.

Section 75–2–201(3)(b) speaks of admissions "in pleading, testimony or otherwise in court". Deposition testimony, similar to that given by the Defendant's agents in the instant case, has been deemed an admission in court in several jurisdictions. *See Harper Plastics, Inc. v. Amoco Chemical Corp.*, 28 UCC Rep. 985, 988–89 (7th Cir. 1980) (deposition testimony as in court admission); *URSA Farmers Cooperative v. Trent*, 58 Ill.App.3d 930, 932–33, 16 Ill.Dec. 348, 350, 374 N.E.2d 1123, 1125, 24 UCC Rep. 18, 20–21 (Ill.App.1978) (discovery deposition deemed in court testimony for purposes of U.C.C. Section 201(3)(b). *Accord Roth Steel Products v. Sharon Steel Corp.* 705 F.2d 134, 142–43 (6th Cir.1983) (admission by party's agent sufficient to make oral contract enforceable against his principal). Clearly, the Mississippi Supreme Court recognizes the judicial admission exception to Section 75–2–201; this Court has no doubt that the Mississippi Supreme Court would hold deposition testimony to constitute a judicial admission.

■ The Court concludes that, if the facts develop at trial substantiating that FMC Corporation waived the requirements of total fulfillment of the conditions prece-

dent to the formation of a distributorship/financing agreement with Plaintiffs, then, as a matter of law, the contract is enforceable under Section 75–2–201(3)(b) to the extent of the Plaintiff's October 5, 1984, shipment order.

A separate Order will be entered in according to this Memorandum Opinion.

## APPENDIX A
## SUPER TIRE MART, INC.

3224 C Avenue          Phone (601) 868-1064

GULFPORT, MISS. 39501
October 5, 1984

FMC Automotive Service Equipment Division
Conway, Arkansas

Dear Sir:

Please ship the following:

| QTY. | MODEL | DESCRIPTION | UNIT PRICE | TOTAL |
|------|-------|-------------|-----------|-------|
| 16 | 7600 | Tire Changer | $1159.77 | $18,556.32 |
| 2 | 4000 | Computer Aligner | 5657.75 | 11,315.50 |
| 1 | 770 | Hoist Rack | 2687.77 | 2,687.77 |
| 1 | 195 | Air Jacks | 590.80 | 590.80 |
| 1 | 68014 | Jack Tray | 246.40 | 246.40 |
| 6 | 601 | Brake Lathe | 2604.19 | 15,625.14 |
| 6 | 671 | Base W/Chip Tray | 191.99 | 1,151.94 |
| 2 | 67 | Brake Service Shops | 2997.24 | 5,004.48 |
| 8 | 4100 | Balancers | 2301.38 | 18,411.04 |
| 6 | 5800 | Balancers | 3094.74 | 18,568.44 |
| 2 | 5800-1 | Balancers | 3276.44 | 6,552.88 |
| 2 | 90873 | Sign Kits | 37.80 | 75.60 |
| 6 | 66393 | Tire Spreaders | 30.10 | 180.60 |
| 3 | 90195 | Disc Silencers | 16.80 | 50.40 |
| 3 | 90194 | Disc Silencers | 4.20 | 12.60 |
| 3 | 90196 | Disc Silencers | 2.80 | 8.40 |
| 2 | 90191 | Drum Silencers | 18.20 | 36.40 |
| 1 | 90060 | 11/16 Arbor & Adapt. Kit | 104.30 | 104.30 |
| | | | | $100,169.01 |

Yours very truly,

EARL J. BABST, PRESIDENT
SUPER TIRE MART, INC.