# FOR PUBLICATION



ATTORNEY FOR APPELLANTS:

**STEVEN STOESZ**
Stoesz & Stoesz
Westfield, Indiana

ATTORNEY FOR APPELLEES:

**DONALD D. LEVENHAGEN**
Landman & Beatty, Lawyers, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT GELLER and JUDY GELLER, | ) | |
| | ) | |
| Appellants-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1111-PL-1202 |
| | ) | |
| KURT P. KINNEY, HOLLY KINNEY, and | ) | |
| A.M. RENTALS, INC., | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Wayne A. Sturtevant, Judge
Cause No. 29D05-0812-PL-2648

**December 7, 2012**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Robert and Judy Geller appeal the trial court's judgment in favor of A.M. Rentals, Inc. ("A.M.") and the court's calculation of damages for the Gellers against Kurt P. Kinney and Holly Kinney.[1] The Gellers raise two issues for our review, namely:

1. Whether the trial court erred in its interpretation of an exculpatory clause in the Gellers' contract with A.M.; and

2. Whether the trial court's calculation of damages against the Kinneys is clearly erroneous.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On March 23, 2011, the Gellers filed their amended complaint against the Kinneys and A.M. Under Count I, the Gellers alleged that the Kinneys had breached their lease agreement, causing the Gellers damages in excess of $70,000. Under Count II, the Gellers alleged that A.M., the Gellers' leasing agent, had failed "to properly investigate the Kinneys before recommending them as tenants," thereby breaching A.M.'s lease management agreement with the Gellers. Appellants' App. at 8. And under Count III, the Gellers alleged that A.M. had breached its duties under Indiana Code Chapter 25-34.1-10 when A.M. had failed to "exercise due diligence and care when investigating possible tenants, recommending tenants to the Gellers, and executing lease agreements on behalf of the Gellers." Id. at 9.

---

[1] The Kinneys have not filed a brief in this appeal.

Following a bench trial, on October 11, 2011, the trial court entered judgment for the Gellers on their claim against the Kinneys but against the Gellers on both claims against A.M. In its order, the court found the following facts:

4. The Gellers . . . lived [at 168 E. Columbine Lane, Westfield, Indiana,] until November 2006, at which time they moved to 15639 Buxton Court, Westfield, Indiana, another house [the] Gellers had purchased in September 2006. Because Mr. Geller was transferred by his employer to a position in Elmhurst, Illinois, effective on January 1st, 2007, the Gellers listed the Columbine Lane house for sale . . . . The house did not sell in the time the Gellers had it listed . . . and they began to consider leasing the property. . . .

5. The Gellers' initial awareness of [A.M.] came from a sign in a subdivision where [A.M.] had another client. They did not consider any other leasing agent and spoke only with [A.M.] about listing the Columbine Lane property for lease. By October 26, 2006, the Gellers had discussed the likelihood of leasing the Columbine Lane property with Decarius Spells, [A.M.'s] representative, entered into the Lease and Management Agreement, and authorized [A.M.] to enter the property into the multiple listing service to begin finding a tenant for the property. One reason for selecting [A.M.] was that the Gellers understood that [A.M.] was a corporate relocation company as well as a home rental company, and because the Gellers believed [A.M.] could attract the type of tenant the Gellers were looking for to place in their home.

* * *

7. Neither party signed the Lease and Management Agreement, but both the Gellers and [A.M.] accept its terms and agree that it is a legally-binding contract for them both. Although Mr. Geller was the one responsible for negotiating the agreement with [A.M.] . . . he admits to not having read the agreement prior to the subsequent lease with the Kinneys but had merely "kind of previewed it." The evidence establishes that the contract was in effect prior to October 26, 2006.

8. It was not until around March 15, 2007, that Decarius Spells, the [A.M.] representative, contacted Mr. Geller and said that he had a party interested in leasing the house. This party was the Kinney family. Up until that time, Mr. Geller had limited contact with Mr. Spells because no other tenants had even previewed the house in the nearly five months it had been listed for lease. Mr. Geller had spoken with Mr. Spells only two other

3

times, those being the original telephone call of introduction and to schedule a time to meet at the house, and the meeting that took place at the house so Mr. Spells could see it. In that time, the Gellers also dropped the requested monthly rental from $3,150 to $2,950, and then to $2,750. Meanwhile, the Gellers were paying mortgages and associated expenses on two houses totaling approximately $5,800 per month. While Mr. Geller's income was $175,000 per year, 22 percent of that amount ($38,500) came from a bonus that he did not receive until the year's end, and therefore[] his gross monthly income before bonus was of $11,375. The Gellers did have another rental property that was renting at a profit of $300 per month that off-set some expenses.

9. The next contact with Mr. Spells was on the day the Kinneys previewed the house, when Mr. Spells called to advise that they liked the house and wanted to submit an application. There was a final call, and in this call[] Mr. Spells discussed the Kinneys' application and sought the Gellers' decision on whether to enter into a lease with the Kinneys. Of note is that[,] in one of these final two telephone calls, the Gellers agreed to another reduction in the monthly lease amount to $2,495. This completed a 21 percent drop from the original monthly rate and was in response to what the Kinneys could afford to pay.

10. The content of this final telephone conversation between Mr. Spells and Mr. Geller forms the factual crux of the lawsuit. In this conversation, Mr. Spells went over the lease application . . . and the Kinneys' credit report . . . with Mr. Geller. Mr. Spells has no recollection of the Gellers, the transaction involving the Gellers and the Kinney lease and specifically has no recollection of his final conversation with Mr. Geller. He testified that he was "very process oriented" and that he would have done everything the same way in accordance with his procedure every time. He further testified that he would have gone over the application and credit report line by line starting at the top and reading down to the bottom. He demonstrated how he did this during his testimony.

11. Mr. Geller does have a specific recollection of this conversation from March of 2007. He recalls that Mr. Spells informed him that [A.M.] had investigated the party and that the employment checked out and the residential information checked out. Mr. Spells further advised Geller that [A.M.] had pulled a credit bureau report and that it revealed that the Kinneys filed bankruptcy several years before, but that since then[] the Kinneys were clean. Geller testified that he asked Mr. Spells to confirm the Kinneys were "clear" since their bankruptcy and [was] told by Mr. Spells that "I wouldn't mislead you."

4

12.      Mr. Geller recalls that he requested to see the credit report and Mr. Spells stated he could not provide it[,] citing "confidentiality issues." Although Mr. Spells stated that he would not have denied such a request, the only evidence before the Court is that [A.M.] did not supply the report to the Gellers nor did they have it from any other source prior to committing to a lease with the Kinneys.  Having now seen that report, Mr. Geller testified that there was information in it that was not conveyed to him by Mr. Spells.  That information specifically was (a) the existence of a high fraud alert stating that the Social Security number used was for an individual between 16 and 18 years of age[. (]The Court finds that this is a misstatement of what [the credit report] reflects.  The credit report says only that Kurt Kinney would have <u>obtained</u> his Social Security number between the ages of 16 and 18, and this is not inconsistent with his age at the time of the report.[)]; (b) the current address provided for the Kinneys was a commercial and not a residential property; and (c) there were approximately $30,000 in delinquent debts incurred by the Kinneys since the filing of their bankruptcy, as well as delinquent car payments and other debts which were shown as current after the date of the bankruptcy.

13.      In demonstrating how he would have gone over the credit report . . . Mr. Spells came to the "Special Messages" section of the Kinneys' credit report, and testified, "And then going to any special messages.  No special messages."   In fact there were "special messages, including this notice: ***HIGH RISK FRAUD ALERT:  INPUT CURRENT ADDRESS IS COMMERCIAL**** AND **** SSN YEAR OF ISSUANCE:  INPUT SSN ISSUED: 1985-86; STATE:  MI FILE SSN ISSUED: 1985-1986; STATE:  MI; (ESTIMATED AGE OBTAINED:  16 TO 18) ***."

14.      Mr. Geller also testified that there was additional information on the Kinneys' application to lease . . . which was not disclosed . . . , including (a) the application revealed the Kinneys were only in their previous home for nine months; (b) the Kinneys' prior rental history had not been investigated and verified, nor did it appear that any of the other information on the application appeared to be verified; and (c) there was a discrepancy between the income listed on the rental application and that given in the job verification letter.

15.      Based on the information that was provided from Mr. Spells and an evaluation of their finances and other available options, the Gellers authorized [A.M.] to enter into the lease with Kinneys . . . for a period of three years at a monthly rental of $2,495.

* * *

18.     The lease took effect March 22, 2007, and was uneventful through August 2007.  In September of 2007[,] however, the Kinneys tendered a non-sufficient funds check to pay their rent, and when this was not made good, [A.M.] filed suit on October 23, 2007, for eviction.  The Kinneys, having already defaulted on the lease, paid no further rent and by court order were required to vacate the property no later than December 2, 2007.  The balance of the rent due under the lease is $74,850.

* * *

21.     Mr. Geller claims that he would not have authorized [A.M.] to proceed with the lease to the Kinneys had he had the information that [A.M.] would have provided.  While there is no question that the additional information would have prompted more questions from Mr. Geller to [A.M.], the totality of the circumstances at the time undermines that assertion when the answers to those questions are unknown.  For example, as to the issue of the age of the person holding Kurt Kinney's Social Security number, a question would have revealed that this issue was nothing more than a misunderstanding of the report.  Further, as to the issue of non-verification of application information, per Marlene Slagle's testimony on behalf of [A.M.], Mr. Geller would have presumably been told that everything except employment had been verified and the verification was in the file despite not being checked off on the application.  It is unknown what follow-up would have been done on any other questions and the impact the additional information would have had on the Gellers' decision.

22.     With this said, the evidence is clear that [A.M.] failed to disclose adverse material facts about the Kinneys that bore directly on the Gellers' ability to evaluate the risks involved with leasing their property to the Kinneys.

* * *

26.     [I]n . . . paragraph [9 of the Lease and Management Agreement] it says, "Agent shall not be liable to Owner for any error in judgment, nor for any good faith act or omission in its performance or attempted performance of any of its duties or obligations under this Agreement."    [("The exculpatory clause.")]

27.     The Gellers were not compelled in any way to enter into the contract with [A.M.]  Mr. Geller is an intelligent consumer with experience in the contracts and financial matters dealing with real estate. . . .  They came to [A.M.] based on seeing one of [A.M.]'s signs in a neighborhood and signed

6

on after minimal contact with Mr. Spells. There is no evidence of any high pressure sales techniques. This was not a situation of one party having a dominant or even an advantageous bargaining position. Mr. Geller chose, without any pressure from [A.M.], to commit to the Lease and Management Agreement.

28.     Mr. Geller testified that he believed, and the Court finds it true, that neither [A.M.] nor Mr. Spells "did anything intentionally." . . .

* * *

34.     [Under the lease agreement with the Kinneys, t]he Gellers, as lessors, were "required to reasonably mitigate damages."

35.     The Kinneys vacated the property on or about December 2, 2007. . . . [I]n January of 2008, the Gellers determined to sell the property rather than to try to rent it again. The home was sold in a "short sale" on March 8, 2008, for $300,000. The Gellers had purchased the home in 2002 for $279,000 . . . , had listed it for sale in the fall of 2006 for $375,000 without success, and relisted it for sale in January 2008 for $339,500. The evidence fails to establish that they took a true loss on the home or that the Kinneys were the cause of that loss. Given the need to relocate and the housing market at the time, such a connection is speculative at best.

Id. at 31-42 (emphases added).

On Count I against the Kinneys, the court concluded that the Kinneys were liable to the Gellers for the amount of unpaid rent between September 2007 and March 8, 2008, or $15,613.87. The court then concluded that, after March 8, 2008, the Gellers mitigated their losses by selling the home. And the court ruled for A.M. on Count II based on the plain language of the Lease and Management Agreement between the Gellers and A.M.

On Count III, the court concluded as follows:

8.     Under Indiana Code § 25-34.1-10-10(a)(3)(C), [A.M.] had a duty to disclose to the Gellers "adverse material facts or risks actually known" by [A.M.]

7

9.    [A.M.], by its agent, Decarius Spells, failed to disclose to the Gellers "adverse material facts or risks" actually known to them as required by the above statute.

10.    While the [relevant statute] establishes a duty owed by a licensee who is an agent for another in a real estate transaction, it provides no penalty for a breach. The Court can only conclude that failure to perform that duty creates a cause of action for either an intentional tort, or for negligence.

11.    In this case, there is no evidence that supports that [A.M.] committed an intentional tort. The evidence does establish, however, that Mr. Spells was negligent in failing to perform a statutory duty owed to the Gellers . . . .

\* \* \*

19.    Although not citing the word "negligence" specifically, the [exculpatory] clause is legally sufficient. It makes clear that [A.M.] is not liable to the Gellers for any good faith act or omission in the performance of its duties under the parties' agreement. This is a faithful rendering in lay person's terms of the legal concept of negligence and puts the Gellers on notice that [A.M.] has no responsibility for mistakes it may make in the performance of its duties.

Id. at 45-48. Thus, the court held that A.M. was not liable to the Gellers under Count III by virtue of the parties' exculpatory clause. This appeal ensued.

**DISCUSSION AND DECISION**

**Standard of Review**

The Gellers appeal the trial court's judgment following the entry of findings of fact and conclusions thereon. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the

8

record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

## Issue One: The Exculpatory Clause

The Gellers first assert that the trial court erroneously concluded that the exculpatory clause exempted A.M. from liability for its breach of duty under Indiana Code Section 25-34.1-10-10(a)(3)(C). According to that statute:

> A licensee representing a seller or landlord has the following duties and obligations:
>
> * * *
>
> (3) To promote the interests of the seller or landlord by:
>
> * * *
>
> (C) disclosing to the seller or landlord adverse material facts or risks actually known by the licensee concerning the real estate transaction . . . .

Ind. Code § 25-34.1-10-10(a). And the exculpatory clause in the parties' contract states: "Agent shall not be liable to Owner for any error in judgment, nor any good faith act or omission in its performance or attempted performance of any of its duties or obligations under this Agreement." Appellants' App. at 39-40.

The Gellers contend that the exculpatory clause is not sufficient to cover A.M.'s failure to perform its duties under Indiana Code Section 25-34.1-10-10(a)(3)(C). On this issue, the trial court concluded that, because the statute does not provide a "penalty for a breach" of its duties, "the failure to perform that duty creates a cause of action for either

9

an intentional tort, or for negligence." Id. at 46. The parties do not challenge that rationale on appeal but, instead, dispute whether the language of the exculpatory clause covers A.M.'s negligent performance of its duties.

We agree with the trial court's ultimate conclusion for A.M. but not with its rationale. It is well established that, "'unless the contract provides otherwise, all applicable law in force at the time the agreement is made impliedly forms a part of the agreement without any statement to that effect.'" Van Prooyen Builders, Inc. v. Lambert, 907 N.E.2d 1032, 1035 (Ind. Ct. App. 2009) (quoting Miller v. Geels, 643 N.E.2d 922, 928 (Ind. Ct. App. 1994), trans. denied), aff'd on reh'g, 911 N.E.2d 619, trans. denied. Accordingly, as a matter of law Indiana Code Section 25-34.1-10-10(a)(3)(C) was an implied part of the Lease and Management Agreement. Thus, the Gellers' claim against A.M. on Count III is a claim that A.M. breached its contractual duties to the Gellers, including the duties listed under Indiana Code Section 25-34.1-10-10(a).

Further, "[w]hen the parties have, by contract, arranged their respective risks of loss . . . tort law should not interfere." Greg Allen Const. Co. v. Estelle, 798 N.E.2d 171, 175 (Ind. 2003). The exculpatory clause exempts A.M. from liability for "any error in judgment" and for "any good faith act or omission in its performance . . . of any of its duties or obligations under this Agreement." Appellants' App. at 39-40. Here, the trial court first found that the Gellers had met their burden of showing that A.M. breached their statutory obligations under Indiana Code Section 25-34.1-10-10(a). Id. at 46. But the court expressly noted that "Mr. Geller testified that he believed, and the Court finds it true, that neither [A.M.] nor Mr. Spells 'did anything intentionally.'" Id. at 40. The court

10

then concluded that A.M. successfully relied upon the plain language of the exculpatory clause as an affirmative defense. See id. at 46-48.

Thus, the trial court did not address whether the Gellers or A.M. would have borne the burden of proof on the intentional act issue. And, in any event, as discussed above this is a contract case that requires this court to consider the application of the contract's plain language to undisputed facts, so an intentional act determination is not required. We cannot say that the trial court's conclusion that the exculpatory clause exempted A.M. from liability for the breach of its statutory duties here was clearly erroneous.

Still, the Gellers contend, and the dissent agrees, that applying the exculpatory clause to the duties listed under Indiana Code Section 25-34.1-10-10(a) violates public policy. Indiana recognizes a "very strong presumption of enforceability" of freely negotiated contracts. Fresh Cut, Inc. v. Fazili, 650 N.E.2d 1126, 1130 (Ind. 1995). Nonetheless, a contract not prohibited by statute or clearly tending to injure the public may be deemed unenforceable as a matter of public policy based on a consideration of the following factors:

> (i) the nature of the subject matter of the contract; (ii) the strength of the public policy underlying the statute; (iii) the likelihood that refusal to enforce the bargain or term will further that policy; (iv) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (v) the parties' relative bargaining power and freedom to contract.

Id. (citations omitted).

Applying those five factors here leads to the conclusion that the exculpatory clause does not violate public policy. The Lease and Management Agreement is an agency agreement between the Gellers and A.M., and the strength of the public policy underlying

Indiana Code Section 25-34.1-10-10(a) is clear. To refuse to enforce the exculpatory clause might further the policy behind the statute. But the statute does not prohibit an exculpatory clause, and a valid exculpatory clause remains enforceable under the common law. And, here, the exculpatory clause is limited in its application to "error[s] in judgment" and only "good faith" breaches of A.M.'s statutory duties. Appellants' App. at 39-40. The exculpatory clause does not protect A.M. from treating its customers in bad faith.

Finally, the fourth and fifth factors here are interrelated and weigh strongly in favor of enforcing the exculpatory clause. The trial court expressly found that Mr. Geller "is an intelligent consumer with experience in the contracts and financial matters dealing with real estate." Id. at 40. Further, the court found "no evidence of high pressure sales techniques. This was not a situation of one party having a dominant or even an advantageous bargaining position. Mr. Geller chose, without any pressure from [A.M.], to commit to the Lease and Management Agreement." Id. Considering those undisputed findings, the parties had equal bargaining power and it would be an "[un]deserved . . . forfeiture" by A.M. for this court to refuse to enforce the exculpatory agreement. See Fresh Cut, 650 N.E.2d at 1130.

In sum, we cannot say that the trial court's enforcement of the exculpatory clause is clearly erroneous. We also hold that enforcing the exculpatory clause on these facts is not contrary to public policy. As such, we affirm the trial court's judgment for A.M.

## Issue Two: Damages

The Gellers also assert that the trial court erroneously concluded that the sale of the home in March of 2008 mitigated their losses from the Kinneys' breach of the lease. The Kinneys have not filed a brief in response on that issue. Accordingly, we do not undertake the burden of developing argument for the appellee, as that duty remains with the appellee. Parkhurst v. Van Winkle, 786 N.E.2d 1159, 1160 (Ind. Ct. App. 2003). When the appellee does not file a brief, we apply a less stringent standard of review and may reverse the trial court when the appellant establishes prima facie error. Id. "Prima facie" is defined as "at first sight, on first appearance, or on the face of it." Id. (citations omitted). If the appellant is unable to meet the burden of prima facie error, however, we will affirm. See Abouhalkah v. Sharps, 795 N.E.2d 488, 490 (Ind. Ct. App. 2003).

The Gellers argue that the trial court misapplied paragraph 13 of their lease agreement with the Kinneys. That paragraph states, in relevant part:

> Upon the occurrence of any Event of Default, Lessor and Lessor's Agent may, at its option, in addition to any other remedy or right it has hereunder or by law:
>
> * * *
>
> c. Terminate this Lease at any time upon the date specified in a notice to Lessees. Lessee[s'] liability for damage shall survive such termination. Upon termination, such damages recoverable by Lessors from Lessees shall be an amount equal to the rent and other payments provided for in this Lease which would have become due and owing thereunder from time to time during the Unexpired Term plus the cost and expenses paid or incurred by Lessor or Lessor's Agent in connection with obtaining possession, removal and storage of Lessee's property, maintenance of Premises while vacant, reletting, lease fee incurred by the owner of the Premises, putting Premises in acceptable condition to relet.

13

d. <u>Without terminating this Lease</u>, Lessors may relet the Premises with[out] the same being deemed an acceptance of a surrender of this Lease nor a waiver of Lessor's rights and remedies and Lessors shall be entitled to damage for the Unexpired Term. Any reletting by Lessors may be for a period equal to or less than or extending beyond the remained [sic] of the original term, or for any sum or to any Lessees or for any use Lessors deem appropriate. <u>Upon any occurrence herein, the Lessor will be required to reasonably mitigate damages.</u>

Pls.' Exh. 4 at 5-6 (emphases added).

According to the Gellers, paragraph 13 created "options available to the Gellers" and, "because the[y] chose to proceed according to paragraph 13c, there was no requirement they mitigate their damages" under paragraph 13d. Appellants' Br. at 13. The Gellers further argue that, even if they did mitigate their damages, that does not prohibit them from pursuing the full unpaid balance from the Kinneys. In sum, the Gellers contend that "enforcement of a savings clause in a lease subverts the doctrine of mitigation of damages." <u>See</u> <u>Nylen v. Park Doral Apartments</u>, 535 N.E.2d 178, 183 (Ind. Ct. App. 1989), <u>trans. denied</u>. We squarely rejected that argument in <u>Nylen</u>. As we explained:

> The doctrine of mitigation of damages creates an obligation on the part of the landlord to use such diligence as would be exercised by a reasonably prudent man under similar circumstances to re-let the premises, if possible, in order to mitigate damages resulting from the tenant's breach of lease. The obligation exists even if there is no mandatory re-letting clause in the lease. Further, courts have recognized and enforced the doctrine of mitigation of damages while at the same time sustaining savings clauses.

<u>Id.</u> (citations omitted).

Stated another way, the Gellers' argument ignores the fact that the duty to mitigate damages is a common law duty independent of the contract terms. <u>See</u> <u>Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC</u>, 870 N.E.2d 494, 507 (Ind. Ct. App. 2007). Further:

14

> [T]he non-breaching party is not entitled to be placed in a better position than he would have been if the contract had not been broken. Indeed, the non-breaching party, as a general rule, must mitigate his damages . . . . Where a party does mitigate its damages, the breaching party is entitled to set off the amount of the damages mitigated.

Id. (citations omitted). And, again, "'it is well settled that, unless the contract provides otherwise, all applicable law in force at the time the agreement is made impliedly forms a part of the agreement without any statement to that effect.'" Van Prooyen, 907 N.E.2d at 1035 (quoting Miller, 643 N.E.2d at 928).

While the Gellers' lease agreement only expressly refers to the duty to mitigate in paragraph 13d, nothing in the language of paragraph 13c indicates that the parties agreed to negate the Gellers' common law duty to mitigate in the event the Gellers chose to proceed with the termination of the lease under paragraph 13c. Accordingly, the trial court's conclusion that the Gellers' sale of the home mitigated their damages is not clearly erroneous.

## Conclusion

In sum, we hold that the exculpatory clause of the Lease and Management Agreement exempts A.M. from liability for its failure to perform its duties to the Gellers under Indiana Code Section 25-34.1-10-10(a)(3)(C). We also hold that applying the exculpatory clause on these facts is not contrary to public policy. Finally, we hold that the trial court's conclusion that the Gellers' sale of their home mitigated the Kinneys' damages to the Gellers is not clearly erroneous. As such, we affirm the court's judgment.

15

Affirmed.

MAY, J., concurs.

KIRSCH, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

ROBERT GELLER and JUDY GELLER,    )
                )
    Appellants-Plaintiffs,      )
                )
        vs.           )    No. 29A02-1111-PL-1202
                )
KURT P. KINNEY, HOLLY KINNEY, and   )
A.M. RENTALS, INC.,       )
                )
    Appellees-Defendants.      )

**KIRSCH, Judge,** *dissenting.*

I respectfully dissent.

Here, the trial court properly concluded that A.M. Rentals, Inc. ("Agent") had a duty under Indiana Code section 25-34.1-10-10(a)(3)(C) to disclose to Robert Geller and Judy Geller (collectively, "Owner") the adverse material facts about the Kinneys' creditworthiness that were actually known by Agent and that it breached this duty. It then found that although Agent was negligent in failing to perform its statutory duty, it had no liability because there was no evidence that Agent had committed an intentional tort, and, accordingly, Agent had no liability because of the exculpatory clause here at issue. I believe that the trial court erred in placing the burden on Owner to prove that Agent had committed an act that was exculpated by the contract and in interpreting the

17

exculpatory clause to require the commission of an intentional act by Agent to establish liability. I also believe that the clause *as interpreted* by the trial court vitiates the contract, contravenes Indiana law and is unconscionable.

The exculpatory clause at issue provides: "Agent shall not be liable to Owner for any error in judgment, nor for any good faith act or omission in its performance or attempted performance of any of its duties under this Agreement." *Appellants' App.* at 39-40.

By the terms of the exculpatory clause, Owner releases Agent from liability according to its terms. Thus, the clause is an affirmative defense that Agent must raise and prove. Ind. Trial Rule 8(C). Agent had the burden of proving that its failure to perform its statutory duty to disclose the known adverse material facts or risks to Owner was due to an act or omission that it made in good faith. The trial court erred in shifting the burden to Owner to prove the converse.

The contract here at issue does not define good faith, and the term is inherently ambiguous.[2] One legal commentator has noted that "the term . . . lacks a fixed meaning . . . because [it] is loose and amorphous."[3] Another described good faith as "indefinable" noting that it is "an elusive term best left to lawyers and judges to define over a period of

---

[2] For an excellent discussion of the inherent ambiguity of good faith, see Stankiewicz, James J., *Good Faith Obligation in the Uniform Commercial Code: Problems in Determining Its Meaning and Evaluating Its Effect,* 7 Val. U. L. Rev 389 (1973). Although Mr. Stankiewicz's comments were in the context of the Uniform Commercial Code, they apply with equal force here.

[3] F.K. Juenger, *Listening to Law Professors Talk About Good Faith: Some Afterthoughts,* 69 Tul. L. Rev. 1253, 1254 (1995).

time as circumstances require."[4]  And, one court has observed that, "It is impossible to define 'good faith' comprehensively and exactly."  *Star Credit Corp. v. Molina,* 298 N.Y.S.2d 570, 573 (Civ. Ct. Rec. 1969).

Good faith requires more than the absence of bad faith.  In *AquaSource, Inc. v. Wind Dance Farm, Inc.,* 833 N.E.2d 535, 539 (Ind. Ct. App. 2005), we defined good faith effort "as what a reasonable person would determine is a diligent and honest effort under the same set of facts or circumstances."  *See also Hamlin v. Steward,* 622 N.E.2d 535, 540 (Ind. Ct. App. 1993).  Professor Steven J. Burton has written that good faith requires parties to act fairly in order "to protect justifiable expectations arising from their agreement."[5]  Good faith under Article Two of the Uniform Commercial Code on the part of a merchant includes the "observance of reasonable commercial standards of fair dealing in the trade."  Ind. Code § 26-1-2-103(1)(b).

The contract here was drafted by Agent.  In accordance with the rules of contract interpretation any ambiguity in the contract will be construed against the party who drafted it.  *Boswell Grain & Elevator, Inc. v. Kentland Elevator Supply, Inc.,* 593 N.E.2d 1224, 1227 (Ind. Ct. App. 1992).  Indiana Code section 25-34.1-10-10 provides that a licensee representing a landlord has the duty to "exercise reasonable care and skill."  Nothing in the contract excused Agent from this duty.  Good faith on the part of a licensed real estate agent should include the exercise of reasonable care and skill.  Such a

---

[4]  P.J. Powers, *Defining the Indefinable:  Good Faith and the United Nations Convention on the International Sale of Goods,* 18 J.L. & Com. 333, 333 (1999).

[5] Steven J. Burton, *Principles of Contract Law,* (2d ed. West Group, 2001) at 444-45.

construction is "what a reasonable person would determine is a diligent and honest effort under the same set of facts or circumstances." *See AquaSource*, 833 N.E.2d at 539. It is also the construction necessary "to protect justifiable expectations arising from their agreement." *See Burton*, *supra*. Finally, it is consistent with the "observance of reasonable commercial standards of fair dealing" in the real estate industry. *See* Ind. Code § 26-1-2-103(1)(b).

Applying these observations of good faith to the contract here at issue and interpreting the contract against Agent, its drafter, the trial court erred in interpreting the exculpatory clause provision of releasing Agent from liability for any action other than an intentional tort. The question before the trial court should have been whether Agent exercised reasonable care and skill in dealing with the adverse material information that it had about the prospective tenants, and the burden of showing such an exercise was on Agent.

Moreover, I believe that the exclusionary clause as interpreted by the trial court vitiates the duties imposed by the contract and by Indiana law on the part of Agent, contravenes public policy and renders the provision unconscionable. The Indiana General Assembly set out the duties that a licensed agent owes to a seller or landlord at Indiana Code section 25-34.1-10-10. Included in those duties are the duties to

promote the interests of the seller or landlord by

. . .

(C) disclosing to the seller or landlord adverse material facts or risks actually known by the licensee concerning the real estate transaction;

. . .

20

(E) timely accounting for all money and property received [and]

. . .

(F) exercising reasonable care and skill . . . .

Here, Agent was a real estate professional licensed and regulated by the State of Indiana. As such, Agent was entitled to the benefits of and subject to the duties imposed by that status. As interpreted by the trial court, the inclusion of exculpatory clause in the form agency agreement enabled Agent to avoid its statutory duties. I believe such an interpretation is unconscionable and contrary to public policy.

Moreover, and as stated above, I believe it is reasonable to interpret the exclusionary clause in a manner that does not contravene public policy or conscionability by interpreting the phrase "good faith act or omissions" to exculpate only acts and omissions that were consistent with Indiana law and reasonable commercial standards in the real estate industry. Such an interpretation, for example, could exculpate the agent from any liability for relaying inaccurate credit reporting information received from a credit reporting agency of the type and character customarily relied upon by real estate professionals.

I would reverse the decision of the trial court and remand with instructions to enter judgment for Owner for all losses incurred as a result of Agent's failure to perform its statutory duties to disclose to Owner the adverse material facts known to Agent and to exercise reasonable care and skill in this transaction.

21