# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

FILED

Jul 28 2020, 9:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANTS

Erik H. Carter
Carter Legal Services LLC
Noblesville, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re the Adoption of R.D: | July 28, 2020 |
| B.L.D. and K.D., | Court of Appeals Case No. 20A-AD-364 |
| *Appellants-Petitioners,* | Appeal from the Cass Circuit Court |
| v. | The Honorable Stephen Roger Kitts, II, Judge |
| B.D. and C.P., | Trial Court Cause No. 09C01-1901-AD-1 |
| *Appellees-Respondents* | |

**Baker, Judge.**

[1] B.L.D. and K.D. (collectively, the Adoptive Parents) appeal the trial court's order denying their petition for adoption, arguing that the trial court erred (1) by finding that Adoptive Parents had not proved by clear and convincing evidence that they could adopt R.D. (Child) without B.D.'s (Mother's) and C.P.'s (Father's) consent due to a lack of significant communication; and (2) by finding that Adoptive Parents had not proved by clear and convincing evidence that consent was not required because Mother and Father were not fit to be Child's guardians and because adoption was in Child's best interests. Finding no error on either front, we affirm.

## Facts

[2] Child was born on January 24, 2017. At the time of birth, Father did not sign Child's birth certificate and did not submit a paternity affidavit. Two days later, on January 26, 2017, Mother went with Child to the home of Adoptive Parents to discuss childcare. Due to Mother's preexisting relationship with B.L.D., Mother asked if Adoptive Parents would temporarily look after Child during Mother's pending incarceration. Adoptive Parents agreed, and on October 4, 2017, all three signed a Temporary Custody Agreement, pursuant to which Adoptive Parents were to have temporary guardianship of and "special power of attorney" for Child. Tr. Vol. II p. 54.

[3] From the time of Child's birth until Mother's first release from incarceration, Father made little effort to reach out to Child or provide any financial support. While incarcerated, Mother permitted Adoptive Parents to file her federal

income tax return and then to subsequently use the $3,264 tax refund to support Child and the household. Mother was eventually released from incarceration on April 24, 2018. Upon release, Mother went to live with Child and Adoptive Parents in their home. During this time, Mother "[bought] things for [Child] while [she] [was] in the home," and attempted to establish a relationship with Child. *Id.* at 159-60. After approximately two months, Adoptive Parents kicked Mother out for personal reasons. Thereafter, Mother's visits with Child were sporadic, and Father's visits were very infrequent.

[4]     Sometime in July 2018, Mother filed a petition to establish Father's paternity and child support. A DNA test proved that Father was, in fact, the biological father of Child. But before the trial court could conduct a hearing on Mother's petition, Mother became incarcerated again on December 25, 2018. Because Mother could not appear for the hearing and did not notify the trial court of her absence, the petition was dismissed, and "no order establishing either paternity or child support was issued by the court." Appealed Order p. 2.

[5]     During her second period of incarceration, Mother did not visit with Child, but did attempt to call Adoptive Parents "at [their] expense." Tr. Vol. II p. 56. There is disputed evidence that Father communicated with or visited Child at Adoptive Parents' home and that Father contributed financially to Child's upbringing. However, it is undisputed that between the years 2017-19, Adoptive Parents moved approximately six times.

[6]     On January 14, 2019, Adoptive Parents filed a petition for adoption of Child, claiming abandonment by Mother and Father and, consequently, arguing that neither party's consent was necessary for the adoption to proceed. Adoptive Parents attempted to serve Father with their petition, but service to Father was returned not served, "having been sent to an incorrect address." Appealed Order p. 3. On January 24, 2019, Mother, from the Howard County Jail, objected to the adoption. On February 21, 2019, Mother was granted leave to appear at an initial hearing. On March 21, 2019, Father appeared with counsel and stated his intent to proceed with separate paternity proceedings. On August 2, 2019, the trial court held another hearing, at which time the trial court "issued a temporary order for custody and parenting time, as well as appointing a Guardian ad Litem and Court Appointed Special Advocate to the case." *Id.* Mother and Father were both granted supervised parenting time.

[7]     At the conclusion of the December 3, 2019, adoption hearing, the trial court took the matter under advisement. On December 6, 2019, the trial court issued an order denying the Adoptive Parents' petition for adoption, awarding physical custody of Child to Father, and granting Mother supervised parenting time. In pertinent part, the order reads as follows:

> Much additional testimony was given with respect to the fitness of all four parties as parents. The record of the hearing indicates much additional information about their personal, family, and criminal histories. The court concedes that it considered the record in its entirety; it merely declines to offer further findings of fact or opinions of the characters of the parties at this time. The court does not find that [Mother] and [Father] abandoned [Child], or that either of them willfully or negligently failed to communicate

with [Child], or provide care for [Child] when able to do so or required by law. Rather, the court finds that both parents were faced with obstruction from [Adoptive Parents] when they made any efforts for [Child's] benefit. The court can find no case on point in which parties were attempting to adopt a child over the objection of a parent based on abandonment after having guaranteed the abandonment through their own willful actions. . . The court considers the three above stated points to be sufficient for its analysis that the evidence that consent is not required per statute is not clear and convincing.

*Id.* at 6. Adoptive Parents now appeal.

# Discussion and Decision

Initially, we note that both Mother and Father have failed to file appellate briefs. "When the appellee does not file a brief, we apply a less stringent standard of review and may reverse the trial court when the appellant establishes prima facie error." *Geller v. Kinney*, 980 N.E.2d 390, 398 (Ind. Ct. App. 2012). "'Prima facie' is defined as 'at first sight, on first appearance, or on the face of it." *Id.* (citing *Parkhurst v. Van Winkle*, 786 N.E.2d 1159, 1160 (Ind. Ct. App. 2003)). "If the appellant is unable to meet the burden of prima facie error, however, we will affirm." *Geller*, 980 N.E.2d at 398.

# I. Lack of Communication

First, Adoptive Parents argue that the trial court erred when it found that they had not proved by clear and convincing evidence that they could adopt Child without both Father's and Mother's consent due to a lack of significant communication.

Our standard of review for these types of cases is well established:

> When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. *In re Adoption of Subzda*, 562 N.E.2d 745, 747 (Ind. Ct. App. 1990). We will not reweigh the evidence, but instead will examine the evidence most favorable to the trial court's decision together with reasonable inferences drawn therefrom, to determine whether sufficient evidence exists to sustain the decision. *Matter of Adoption of Marcum*, 436 N.E.2d 102, 103 (Ind. Ct. App. 1982). We note that a petitioner for adoption without parental consent bears the burden of proving the statutory criteria for dispensing with such consent in Ind. Code § 31-19-9-8(a)(2) by clear, cogent and indubitable evidence. *In re Adoption of Augustyniak*, 505 N.E.2d 868, 870 (Ind. Ct. App. 1987); *Matter of Adoption of Ryan L.*, 435 N.E.2d 624, 625 (Ind. Ct. App. 1982). If the evidence most favorable to the judgment clearly, cogently, and indubitably establishes one of the criteria for granting adoption without parental consent and, thereby, for the termination of parental rights without consent, we will affirm the judgment. *In re Adoption of Childers*, 441 N.E.2d 976, 978 (Ind. Ct. App. 1982). Finally, the decision of the trial court is presumed to be correct, and it is the appellant's burden to overcome that presumption. *Id.*

*Rust v. Lawson*, 714 N.E.2d 769, 771-72 (Ind. Ct. App. 1999).

Indiana Code section 31-19-9-8(a)(2) states that:

> (a) Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:
>
> ***
>
> > (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
> >
> > > (A) fails without justifiable cause to communicate significantly with the child when able to do so; or

> (B) knowingly fails to provide for the care and
> support of the child when able to do so as required by
> law or judicial decree.

[12] Here, the trial court found that both Mother and Father faced significant obstruction by Adoptive Parents when attempting to communicate with Child. Adoptive Parents disagree, arguing that both Mother and Father failed to communicate significantly with Child at any time since Child's birth.

[13] Adoptive Parents filed their petition for adoption on January 14, 2019. Thus, Adoptive Parents had to prove by clear and convincing evidence that both Mother *and* Father failed without justifiable cause to communicate significantly with Child when able to do so between January 14, 2018, and January 14, 2019. And based on the record, we find that the trial court did not err by concluding that Adoptive Parents did not clear this threshold.

[14] To start, during Mother's first incarceration, she coordinated with the Adoptive Parents to sign a Temporary Custody Agreement, pursuant to which the Adoptive Parents would care for Child in Mother's absence. The Adoptive Parents argue that though "there was conflicting testimony over the scope and intention of this handwritten agreement, there is no testimony that Mother at any time requested to take [Child] into her possession and custody." Appellant's Br. p. 20. This logic is, for lack of a better term, baffling to us. The Temporary Custody Agreement contains a clause that explicitly states that the guardianship will expire on "3/17/2018 or my release date from prison, whichever is earlier[.]" Appealed Order p. 4. Thus, Mother did not abandon

Child by signing the Agreement—indeed, she was trying to ensure that Child was cared for while Mother was unable to do so herself. We would be remiss to punish Mother for entrusting Child to responsible guardians on a temporary basis. The fact that the Adoptive Parents seek to use the Temporary Custody Agreement as evidence against Mother seems duplicitous and, quite frankly, perfidious.

[15] Between Mother's release on April 24, 2018, and January 14, 2019, there were periods during which Mother communicated with and financially provided for Child. After her initial release from incarceration, Mother went to live with Adoptive Parents at their request. It is undisputed that Mother bought things for Child, attempted to establish a relationship with him, and even allowed Adoptive Parents to use her tax refund to provide for Child. In July 2018, Mother instituted paternity and child support proceedings against Father so that she would have more money for Child's support. Further, after Mother was reincarcerated on December 25, 2018, she frequently called Adoptive Parents to communicate with Child.

[16] Those concerted efforts, in effect, interrupted the one-year lull of significant communication that the Adoptive Parents had to prove to adopt Child without Mother's consent. Our Supreme Court has held that "a single significant communication within one year is sufficient to preserve a non-custodial parent's right to consent to the adoption." *E.B.F. v. D.F.*, 93 N.E.3d 759, 763 (Ind. 2018). And here, no matter how sporadic her communications were, Mother did enough to require Adoptive Parents to obtain her consent before adopting.

In other words, the trial court did not err in its assessment by denying Adoptive Parents' petition for adoption on this basis.

# II. Fitness of Parents

Next, Adoptive Parents argue that the trial court erred by finding that Adoptive Parents had not proved by clear and convincing evidence that consent was not required because Mother and Father were not fit to be Child's guardians and because adoption was in Child's best interests. Once again, "we will not disturb the trial court's decision in an adoption proceeding unless the evidence leads only to a conclusion opposite that reached by the trial court." *In re Adoption of J.T.A.*, 988 N.E.2d 1250, 1252 (Ind. Ct. App. 2013). It is our job to reexamine the evidence most favorable to the trial court's decision, "together with reasonable inferences drawn therefrom, to determine whether sufficient evidence exists to sustain the decision." *Id.*

Indiana Code section 31-19-9-8(a)(11) states that:

> (a) Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:
>
> ***
>
> (11) A parent if:
>
>> (A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and
>>
>> (B) the best interest of the child sought to be adopted would be served if the court dispensed with the parent's consent.

[19] Here, while the trial court did not make an explicit finding as to Mother and/or Father's fitness or to Child's best interests, we give considerable deference to trial courts for family law matters because they are in the best position to analyze facts, determine witness credibility, and "'get a feel for the family dynamics[.]'" *E.B.F.*, 93 N.E.3d at 762 (quoting *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005)). And here, the trial court clearly believed that neither Mother nor Father were unfit and that it was not in Child's best interests to be adopted without their consent.

[20] Specifically, the trial court faults Adoptive Parents for "obstruct[ing]" both biological parents in their attempts to communicate with Child. Appealed Order p. 6. And the record shows that it was not erroneous for the trial court to reach that decision. Not only did Adoptive Parents agree to temporarily care for Child while Mother was incarcerated—only to later use that as evidence that Mother purportedly abandoned Child—but Adoptive Parents also moved roughly six times over a three-year span, making it extremely challenging for Mother and Father to locate them and Child. The trial court took note of this when admonishing Adoptive Parents for failing to have a constant address that Father could contact during the adoption proceedings.

[21] Further, the trial court established supervised parenting time for both Mother and Father and appointed a Guardian ad Litem and a CASA. It is apparent that despite the paucity of early intervention and communication by Father, the trial court thought it fit to grant Father parenting time under the court's watch *and* to

award him physical custody. Once again, we find nothing errant or incorrect about the trial court's decisions.

[22] At the crux of the trial court's conclusion is the fact that Mother and Father did not abandon Child. While the trial court "merely decline[d] to offer further findings of fact or opinions of the characters of the parties at this time," *id.*, it is unambiguous that the trial court saw both Mother and Father as fit to care for Child. Though the record is comprised of significant evidence demonstrating that Adoptive Parents would be suitable guardians, that is not the question before us. Rather, we are tasked with determining whether the trial court erred when it ruled against Adoptive Parents on their claim that the biological parents were unfit. And quite honestly, Adoptive Parents proffer no significant evidence proving that it would not be in Child's best interests for his biological parents to remain as primary caregivers rather than for Child to be adopted without Mother and Father's consent.

[23] We reiterate that these are fact-sensitive matters that require diligence and an eye towards the best interests of the Child. Here, we find that the trial court did not err by finding that Adoptive Parents did not prove by clear and convincing evidence that Mother and Father were not fit to be Child's guardians and that adoption was in Child's best interests. There is no doubt that Adoptive Parents love and wish to care for Child on a permanent basis. Yet, Indiana law requires the biological parents' consent or some alternative showing that consent was not necessary. And here, neither is present.

The judgment of the trial court is affirmed.

Bailey, J., and Vaidik, J., concur.